### CHARLES C. PATSOS *vs.* FIRST ALBANY CORPORATION & another.[1]

No. 97-P-1786.

Suffolk. September 21, 1999. - November 23, 1999.

Present: ARMSTRONG, GILLERMAN, & PORADA, JJ.

Further appellate review granted, 431 Mass. 1101 (2000).

*Contract,* With broker, Performance and breach, Implied covenant of good faith and fair dealing. *Limitations, Statute of. Practice, Civil,* Statute of limitations. *Broker,* What constitutes relation. *Fiduciary.*

In an action brought by an investor against a corporate broker-dealer for the alleged conversion by the defendant's agent of substantial funds of the plaintiff, summary judgment should not have been ordered in favor of the defendant on the basis of the statute of limitations, where the allegations in the complaint raised issues of material fact as to whether the defendant's breach of its fiduciary duty of disclosure constituted fraudulent conceal- ment such that the statute of limitations did not begin to run until the plaintiff discovered the conversion and fraud. [270-273]

CIVIL ACTION commenced in the Superior Court Department on November 28, 1995.

The case was heard by *Barbara J. Rouse,* J., on a motion for summary judgment.

*Steven Rosenberg* for the plaintiff.

*Stephen A. Weiner* for the defendant.

GILLERMAN, J. First Albany Corporation (defendant) is a broker-dealer in the securities business with its headquarters in Albany, New York, and a branch office in Boston. From April, 1988, through August, 1989, Edward Accomando, see note 1, was employed by the defendant as a registered representative

---

[1]Edward Accomando. Mr. Accomando was served with process but filed no answer and was defaulted.

authorized to effect securities transactions for the account of customers of the defendant, including the plaintiff.[2]

The complaint, which was filed on November 28, 1995, alleges that Accomando, in the course of buying and selling securities for the plaintiff's account, but without the knowledge or approval of the plaintiff, withdrew from the plaintiff's account more than $1,600,000 to pay for Accomando's gambling debts and other personal adventures. Claims were asserted against the defendant for conversion, breach of fiduciary duty, breach of contract, lack of good faith, negligent supervision, and violation of c. 93A.

The defendant filed an answer and counterclaim on December 18, 1995. The answer, duly signed by defendant's counsel, denied that there was any conversion of funds by Accomando.[3] Thereafter, the defendant filed a motion for summary judgment, arguing principally that the plaintiff's claims were barred by a six-year statute of limitations. The plaintiff filed his opposition to the motion and a detailed affidavit in support of his opposition. A judge of the Superior Court allowed the defendant's motion for summary judgment; judgment entered for the defendant; the plaintiff appealed; and we now reverse.

We follow an established path in approaching the question whether there is any genuine issue of any material fact presented by the record before us. "[W]e view the facts in the light most favorable to the party opposing summary judgment . . . [and] we assume that all of the facts set forth in the [opposing party's] affidavit [are] true." *Graham* v. *Quincy Food Serv. Employees Assn. & Hosp., Library & Pub. Employees Union*, 407 Mass. 601, 603 (1990) (citation omitted). Further, the nonmoving party is entitled to the benefit of any favorable inferences. *O'Gorman* v. *Rubinaccio & Sons, Inc.*, 408 Mass. 758, 759 (1990). *Willits* v. *Roman Catholic Archbishop of Boston*, 411

---

[2]The complaint alleges that the plaintiff invested in his own name and in the names of various nominees. We treat the plaintiff, then, as the only party in interest in this litigation.

[3]The eighth affirmative defense asserts that the plaintiff has no standing to maintain this action because of his pending bankruptcy proceeding filed in the Eastern Division of the District of Massachusetts. However, there is no suggestion of bankruptcy filed in this case, and there is no appearance of any counsel representing the bankrupt estate, if there is one.

Mass. 202, 203 (1991). The material assertions of fact in the plaintiff's affidavit, as to their main features, are undisputed.[4]

At the commencement of the plaintiff's relationship with Accomando, the plaintiff told Accomando that he had no experience in buying or selling securities and that he would rely on Accomando and the defendant to make all investment decisions using the funds that the plaintiff transferred to the defendant. The plaintiff's affidavit states that he "completely trusted Edward Accomando and the financial advice he was giving me. Throughout 1988 and 1989 Edward Accomando had virtually complete control over my account and I relied on him to purchase the securities he assured me he was purchasing on my behalf." The plaintiff received monthly statements from the defendant, but he told Accomando that he did not understand the statements. Accomando told him "not to worry."

Various monthly statements sent by the defendant to the plaintiff in 1988 and 1989 showed the entry, "issued by Boston." The statement described the entry as a "check," and the statement showed the dollar amount of the "check." The statements did not include any explanation of the phrase "issued by Boston." These entries for "checks" were debits to the plaintiff's account. The plaintiff never understood what the entry "issued by Boston" meant, and he never received from the defendant copies of the checks to which the statements referred, nor was he ever told whose signature appeared on the checks.

Either in late December, 1994, or early in January, 1995, the

---

[4]There are portions of the affidavit which might have been excludable upon the defendant's motion to strike, but so far as appears in this record, there was no motion to strike below, and there is no claim in this court that we should not consider portions of the plaintiff's affidavit. There being no objection either below or here, we exercise our discretion and consider the entire affidavit. See *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985). The plaintiff's affidavit presented the fact of the embezzlement by describing the plaintiff's interview with the Federal Bureau of Investigation and a Justice Department task force. In its answer to the complaint, the defendant has denied that there was any embezzlement, but according to plaintiff's affidavit — based on a letter to the defendant from the plaintiff's attorney demanding to see the checks and other material documentation regarding the plaintiff's account, as well as the reply letter from defendant's counsel, both of which are reproduced in the record appendix — the defendant has refused to turn over the checks and other documentation which could, it would seem, prove or disprove the embezzlement. We regard this undisputed exchange of letters between attorneys as entirely reliable. In sum, we consider the plaintiff's affidavit in full.

plaintiff was interviewed by an agent of the Federal Bureau of Investigation (FBI) and by attorneys from the Department of Justice New England Bank Fraud Task Force. It was then that the plaintiff learned for the first time that Accomando had withdrawn the plaintiff's funds by drawing checks on the plaintiff's account and then had converted those funds to his own use. The FBI inquired about payments made to Bally's Gambling Casino and the Boston Celtics — payments the plaintiff was then told came from his brokerage account with the defendant. The plaintiff was told that, as a result of the Federal investigation, Accomando's Federal license as a broker had been revoked. The plaintiff did not know, as of the date of his affidavit, how much of his money had been taken by Accomando. See note 4, *supra*. During the interview, the plaintiff was also shown letters authorizing the transfer of funds from the plaintiff's account, but, according to the plaintiff, the signatures on the letters were forgeries.

On January 24, 1995, plaintiff's counsel wrote the defendant asserting that the plaintiff's funds had been wrongfully withdrawn and converted to the personal use of the defendant's agents, and he made demand upon the defendant for all of the plaintiff's records. By letter dated February 6, 1995, defendant's counsel replied, rejecting all claims, and threatened to resist "vigorously" any action against the defendant.

According to the plaintiff's affidavit, the interview by the FBI took place either in late December, 1994, or in early January, 1995. The inferences favorable to the plaintiff, which we draw, are that it was highly likely that the defendant in fact was aware of the alleged embezzlement by February 6, 1995, and, if so, the defendant's February 6 letter was another act in the continuing concealment.[5] Further, we note that the complaint was filed on November 28, 1995, ten or eleven months after the FBI interviewed the plaintiff. On December 18, 1995, counsel to the defendant filed an answer denying outright "that there was a conversion of [the plaintiff's] funds by Accomando."

This case, as it now stands, presents material questions of fact. If the defendant's denial of wrong-doing by it or by Accomando can be substantiated by credible and admissible evidence, it may appear that the plaintiff's suit has no merit. On the other hand, if the allegations of the complaint and the plaintiff's af-

---

[5]A copy of counsel's letter of February 6, 1995, was sent to the defendant's vice-president and general counsel.

fidavit can be substantiated by credible and admissible evidence, then it may appear that the defendant has deliberately concealed wrongdoing by it and by its agent for whom it is responsible. It can hardly be doubted that, but for the defense of the statute of limitations, the matter would be remanded to the Superior Court for further proceedings to resolve these questions.

*Discussion.* We arrive at the underlying and dispositive legal issue of this appeal — whether, in the factual context described above, the plaintiff's action is barred by the six-year statute of limitations, the longest of the statutes of limitation that bear on the plaintiff's claims.[6] Since the complaint alleges that all of the checks were drawn on the plaintiff's account "[f]rom at least June, 1988, through August, 1989," all of the unauthorized checks[7] were drawn more than six years prior to the commencement of the plaintiff's action on November 28, 1995.

The plaintiff responds that G. L. c. 260, § 12, is available to him. That section reads, "If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." The defendant's rejoinder, citing *Lynch* v. *Signal Fin. Co.*, 367 Mass. 503, 507 (1975), is that § 12 is not available since the defendant has been merely "silent" following the issuance of its monthly statements to the plaintiff. The defendant adds that there was no fiduciary relationship between the parties, but even if there was such a relationship, the argument continues, the defendant's monthly statements constituted "timely disclosure" of all material information, and the defendant is entitled to judgment as matter of law.[8] We conclude that these arguments are not persuasive.

Whether a broker-principal relationship was seen as a

---

[6]The plaintiff's claims for breach of contract and implied covenant of good faith and fair dealing must be brought within "six years next after the cause of action accrues," see G. L. c. 260, § 2; his claims for conversion, breach of fiduciary duty, and negligent supervision must be brought within "three years next after the cause of action accrues," see G. L. c. 260, § 2A; and his claim under c. 93A must be brought "within four years next after the cause of action accrues," see G. L. c. 260, § 5A.

[7]The plaintiff acknowledges that some of the checks may have been authorized to pay for the purchase of securities for the plaintiff's account.

[8]The affidavit of the defendant's general counsel and vice-president filed in support of the defendant's motion for summary judgment states that the

fiduciary relationship or as a business relationship had a varied history in Massachusetts until Chief Justice Qua wrote *Berenson* v. *Nirenstein,* 326 Mass. 285 (1950). There, demurrers to the amended bill were sustained and the plaintiff appealed. The facts alleged in the amended bill were these. The defendant approached the plaintiff and offered to act as the plaintiff's broker and agent in seeking to buy the outstanding shares of Bowles Lunch, Inc. The defendant represented that he was uniquely in a position to conduct the negotiations because of his knowledge of the parties. The plaintiff agreed to retain the defendant as his broker and agent, and to pay an agreed commission of $5 per share. The defendant agreed to use his best efforts to purchase the shares for the plaintiff. Thereafter, the defendant, while still representing the plaintiff, purchased Bowles Lunch for himself.

The court held that the conduct of the parties revealed that "the full relation of principal and broker ha[d] come into existence . . . [and] there ha[d] come into existence with it a confidential and fiduciary relation." *Berenson* v. *Nirenstein, supra* at 289. The decrees sustaining the demurrers were reversed. See *Vogelaar* v. *H.L. Robbins & Co.,* 348 Mass. 787, 788 (1965) (demurrer sustained in a case against a stockbroker and a securities firm, but the case was remanded to the Superior Court in order to allow an amendment to the bill stating a case of a fiduciary relationship, it "not [being] clear that the plaintiff cannot state a case good against demurrer").

Returning to this case, on the facts alleged in the plaintiff's affidavit, and favorable inferences therefrom, we conclude that the plaintiff has made a forceful showing that a jury would be justified in finding that as a result of the defendant's representative, Accomando, having informed the plaintiff that he would at all times act as agent and broker for the plaintiff in the purchase and sale of securities with funds supplied by the plaintiff, and the plaintiff's complete reliance on the representations of Accomando, a "full relation of principal and broker" came into existence, and with it a fiduciary relationship between the defendant and the plaintiff. *Berenson* v. *Nirenstein, supra.* On that basis, the conversion of the plaintiff's funds by Accomando to his own use would result in the defendant's liability for the

monthly statements sent to the plaintiff contained "[n]o false or erroneous information," and that the defendant "expected that its customers would communicate promptly with it concerning any problems or disagreements which they had with their statements as rendered."

funds so converted. *Ibid.* See *Broomfield* v. *Kosow*, 349 Mass. 749, 754-758 (1965) (where plaintiff reposes trust and confidence in the defendant, and the defendant knows of the plaintiff's reliance on him, a fiduciary relation is created). See also *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 313 (1988) ("[g]enerally, the fraud of an agent acting in the course of his employment binds his principal"); Restatement (Second) of Agency § 13 (1958) ("[a]n agent is a fiduciary with respect to matter within the scope of his agency"), and comment a ("[t]he agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in a matter connected with his undertaking"); Restatement (Second) of Agency § 261 comment a (1958) (liability of the principal results if "the agent's position facilitates . . . the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him").

If a fiduciary relationship is found to exist, a jury would also be justified in finding that the defendant's monthly statements with the legend "issued by Boston" constituted a failure adequately to disclose Accomando's embezzlement, where (i) the defendant's "headquarters," as stated above, was in Albany, New York, (ii) stock purchases would in the ordinary course of business be paid from the defendant's account, and (iii) Accomando told the plaintiff "not to worry" when the plaintiff said that he did not understand the defendant's monthly statements. Massachusetts follows the rule of the majority of jurisdictions that "factual disputes concerning when a plaintiff knew or should have known of his cause of action are to be resolved by the jury." *Riley* v. *Presnell*, 409 Mass. 239, 247-248 (1991). Such a finding would make available the tolling provisions of § 12, see *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 519 (1997) ("[w]here a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12"), and the defense of the statute of limitations would fall away. "An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G. L. c. 260, § 12." *Ibid.*

There remains only the defendant's reliance on paragraph 14 of the defendant's "customer's agreement" which the plaintiff signed April 6, 1988, and which reads, "Reports of the execution of orders and statements of the accounts of the undersigned shall be conclusive if not objected to in writing, the former within two days, and the latter within ten days."

The defendant argues that the plaintiff made no complaint regarding the statements he had received until his counsel's letter dated January 24, 1995. If we assume, as we must, that the plaintiff's funds on deposit with the defendant were secretly converted to the personal use of Accomando and that the plaintiff had no knowledge of the embezzlement until the FBI interview early in 1995, then the plaintiff's failure to object within ten days of each of the defendant's statements in 1988 and 1989 was the direct result of the defendant's alleged fraudulent concealment of the embezzlement, and the ten-day notice provision would not bar the plaintiff's action. The defendant's allegedly fraudulent concealment cannot be asserted to defeat what may be legitimate claims for substantial damages.

The judgment is reversed, and the case remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*