CHARLES C. PATSOS *vs.* FIRST ALBANY CORPORATION
& another.[1]

Suffolk. October 2, 2000. - February 5, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Limitations, Statute of. Practice, Civil,* Statute of limitations. *Fiduciary. Broker,* What constitutes relation.

An investor seeking to hold his investment broker-dealer liable for conversion, breach of contract, and related claims did not demonstrate that the defendant's employee's conversion of the plaintiff's funds was "inherently unknowable" so as to toll the applicable statutes of limitations [328-329]; however, sufficient evidence was presented on the record of the defendant's motion for summary judgment to demonstrate that the defendant breached its fiduciary duty adequately to disclose information that would have apprised the plaintiff that his funds had been converted by the defendant's agent and employee and, thus, to toll the statute of limitations pursuant to G. L. c. 260, § 12: the motion for summary judgment should have been denied [329-331, 336-338].

Discussion of cases considering the nature and scope of the relationship between a stockbroker and a customer, and discussion of the considerations that distinguish a fiduciary relationship from an ordinary business relationship in such circumstances. [331-336]

CIVIL ACTION commenced in the Superior Court Department on November 28, 1995.

The case was heard by *Barbara J. Rouse*, J., on a motion for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Steven Rosenberg* for the plaintiff.

*Stephen A. Weiner*, of New York (*Takemi Ueno*, of New York, with him) for First Albany Corporation.

MARSHALL, C.J. We consider in this case whether claims by a customer against his broker-dealer in the securities business are barred by the applicable statutes of limitations. A judge in the

---

[1]Edward Accomando. Accomando was served with process but served no answer; a default judgment was entered against him.

Superior Court concluded that they were, and entered summary judgment for the defendant on all counts. The plaintiff appealed, and the Appeals Court vacated the judgment. *Patsos* v. *First Albany Corp.*, 48 Mass. App. Ct. 266 (1999). We granted the defendant's application for further appellate review. We agree with the well-reasoned decision of the Appeals Court, but take this opportunity to clarify relevant points of law. We vacate the judgment and remand the case to the Superior Court for further proceedings consistent with this opinion.

I

We view the facts in the light most favorable to the plaintiff, Charles Patsos, the party opposing summary judgment. We assume that all of the facts in his detailed affidavit are true, *Graham* v. *Quincy Food Serv. Employees Ass'n & Hosp., Library & Pub. Employees Union*, 407 Mass. 601, 603 (1990), drawing from them all inferences favorable to him. *O'Gorman* v. *Rubinaccio & Sons*, 408 Mass. 758, 759 (1990).[2]

First Albany Corporation (First Albany) is a broker-dealer in the securities business. With headquarters in Albany, New York, it has a branch office in Boston. From April, 1988, through August, 1989, Edward Accomando was employed by First Albany as its registered representative authorized to effect securities transactions for its customers. Patsos alleged that from June, 1988, through approximately August, 1989, Accomando improperly withdrew more than $1.6 million from Patsos's First Albany accounts, without his knowledge or approval.

The circumstances of Patsos's dealings with Accomando are these. In 1987, Patsos, who previously had not invested in the

---

[2]As the Appeals Court correctly noted, portions of Patsos's affidavit made on information and belief might have been excludable had First Albany Corporation (First Albany) filed a motion to strike in the trial court. See *Patsos* v. *First Albany Corp.*, 48 Mass. App. Ct. 266, 268 n.4 (1999); *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985), quoting *Shapiro Equip. Corp.* v. *Morris & Son Constr. Corp.*, 369 Mass. 968, 968 (1976) ("All affidavits or portions thereof made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summary judgment"). Because First Albany did not object to any portion of Patsos's affidavit, we may consider it in its entirety. *Id.* at 721, citing *Stetson* v. *Selectmen of Carlisle*, 369 Mass. 755, 763 n.12 (1976) ("If a party does not move to strike the defective portion of an opponent's affidavit, in his discretion a judge may rely on the fact[s] stated on belief").

securities market, was introduced to Accomando. Accomando represented to him that, if followed, his investment advice could make Patsos "a great deal of money." While it is not clear when Accomando first began advising Patsos, at some point Patsos bought approximately $8 million of Central Cooperative Bank stock on Accomando's advice, approximately one-half of which was purchased on a margin account.

Sometime between the purchase of the Central Cooperative Bank stock and early January, 1988, Accomando twice advised Patsos that he was at risk of losing his entire investment if he did not pay down his margin account. Accomando also told Patsos that he could arrange a "private" or "negotiated" sale of the stock that would permit Patsos to pay down the account without affecting the market price of the stock. In late December, 1987, or early January, 1988, Accomando executed a $1 million transaction to that effect on behalf of Patsos.

Around that time Accomando informed Patsos that he intended to switch brokerage firms and become an employee of First Albany. His new affiliation, he told Patsos, would allow Patsos to invest a larger percentage of his account on margin, thereby providing greater protection for his investments and relieving Patsos of periodic margin calls when the market value of the Central Cooperative Bank stock dropped below a certain price.[3] Patsos established five brokerage accounts with First Albany after it employed Accomando.[4] During 1988 and 1989, while employed by First Albany, Accomando continued to advise Patsos concerning which stocks to purchase, how many shares to buy, and when to make the purchases. Patsos trusted Accomando completely, and First Albany has not challenged Patsos's statement that Accomando exerted "complete control" over his accounts.

Patsos states, and we must accept as true, that he lacked the

---

[3]The New York Stock Exchange and National Association of Securities Dealers require that a margin account contain at least twenty-five per cent equity. See Securities and Exchange Commission, Margin: Borrowing Money to Pay for Stocks 1-5 (2000). A brokerage firm agreement may, however, require an investor to keep a higher percentage of equity in the account. Id.

[4]Patsos opened one brokerage account with First Albany in his own name, and four other accounts in the names of persons described in his complaint as "nominees." Patsos invested funds through the nominee accounts, as well as his own account, during the period in question. We treat Patsos as the only party in interest in this litigation, as did the Appeals Court. Patsos v. First Albany Corp., supra at 267 n.2.

experience and expertise needed to buy and sell stocks and that he relied entirely on Accomando's advice, knowledge, and experience. First Albany has also not challenged that Patsos informed Accomando that he was an unsophisticated investor, and that Accomando encouraged Patsos to trust him. While they spoke frequently regarding the accounts, Accomando often did not tell Patsos about executed transactions until after they had been completed, if at all. Patsos authorized a second private sale of his Central Cooperative Bank stock worth $1.75 million in March or April, 1989, after Accomando again persuaded him that he was at risk of losing his investment if he did not pay down his margin account. Although Accomando was by then employed by First Albany, Patsos received no documentation that the sale had taken place; he relied on Accomando's assurance that it had been completed.

After Patsos became a customer, First Albany sent him monthly statements advising him of the status of each of his accounts. The content of those statements inform First Albany's defense. Each First Albany statement covered a particular period and referenced the account number and the name of the "investment executive," Edward Accomando. Of relevance to this case is account activity described in some of the monthly statements as "issued by Boston": thirty-one transactions executed between June 14, 1988, and July 31, 1989, are described this way. For each such entry, the word "check" or "CKS" appears in a column headed "price or entry," with a dollar amount entered in the corresponding "debit" column. The dollar amount of each "check" varied, ranging from $1,000 to $1.06 million. Patsos states that he did not understand the meaning of the term "issued by Boston," and never received copies of the checks to which the statements apparently referred. When he told Accomando that he did not know how to decipher the statements, Accomando responded by telling him "not to worry."

In late December, 1994, or early January, 1995, agents of the Federal Bureau of Investigation (FBI) and attorneys from the United States Department of Justice New England bank fraud task force, investigating Accomando's business dealings, interviewed Patsos about checks drawn on his First Albany accounts payable to a gambling casino, a professional sports team, and others. It was then that Patsos learned for the first time that Accomando had converted significant funds for his own personal use. Patsos was also told that, as a result of the investigation,

Accomando's broker's license had been revoked. Patsos was shown documents authorizing the transfer of the funds from his accounts, but according to Patsos the signatures on the documents were forged.

On January 24, 1995, counsel for Patsos wrote to First Albany, asserting that funds belonging to Patsos and his nominees had been wrongfully withdrawn from accounts handled by Accomando and converted to the personal use of First Albany's employees. The letter identified and challenged thirty-three checks, totaling $1,672,230.70, charged to the five accounts. Counsel made demand for copies of all of Patsos's records, including copies of all checks drawn against his accounts. By letter dated February 6, 1995, First Albany rejected all of the claims, informing Patsos that it would vigorously defend any action against it. First Albany also refused to deliver the account records and copies of the disputed checks.[5]

According to Patsos, his FBI interview took place in either late December, 1994, or early January, 1995. We agree with the Appeals Court that the inferences favorable to Patsos, which we also draw, are that it was highly likely that First Albany was aware of the alleged embezzlement by February 6, 1995, and, if so, the defendant's February 6 letter could be viewed by a jury as an act of concealment. Patsos v. First Albany Corp., supra at 269. As the Appeals Court also noted, Patsos filed his complaint on November 28, 1995, approximately ten or eleven months after the FBI interviewed him. Id. Nevertheless on December 18, 1995, First Albany filed an answer denying outright "that there was a conversion of [Patsos's] funds by Accomando."

In short, the pleadings and affidavits present material questions of fact concerning the allegations of wrongdoing by First Albany or Accomando that would preclude entry of summary judgment. But the challenged checks were drawn from June, 1988, through August, 1989, more than six years prior to the commencement of this action on November 28, 1995. First Albany asserts that all of Patsos's claims — for conversion, breach of fiduciary duty, breach of contract, lack of good faith, negligent supervision, and violation of G. L. c. 93A — are therefore barred by the applicable statutes of limitations.[6]

---

[5]At the time Patsos filed his affidavit in early 1996, he did not know how much of his money had been wrongfully withdrawn by Accomando.

[6]Claims for breach of contract and breach of implied covenant of good faith

## II

To defeat First Albany's motion for summary judgment, Patsos seeks to avail himself of the discovery rule. The rule, which operates to toll a limitations period until a prospective plaintiff learns or should have learned that he has been injured, may arise in three circumstances: where a misrepresentation concerns a fact that was "inherently unknowable" to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive. *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 631-632 (1997). On appeal, Patsos relies on the first two theories.[7] First, Patsos contends that he could not have discovered Accomando's conversion of his funds before his FBI encounter because the transactions were "inherently unknowable."[8] Second, he argues that a jury reasonably could conclude that First Albany breached its fiduciary duty to reveal to him facts that, if disclosed, would have made him aware of the alleged embezzlement. This failure, he claims, constituted fraudulent concealment and thereby triggered the tolling protection of G. L. c. 260, § 12,[9] until he was informed by the FBI in late 1994 or early 1995 that his funds had been misappropriated.

We may summarily dispose of his first argument. We agree

and fair dealing must be brought within six years after the cause of action accrues, G. L. c. 260, § 2; the claim under G. L. c. 93A must be brought within four years after the accrual of the action, G. L. c. 260, § 5A; and the claims for conversion, breach of fiduciary duty, and negligent supervision must be brought within three years of the accrual of the action, G. L. c. 260, § 2A.

[7]Patsos does not pursue his argument that First Albany affirmatively concealed the embezzlement, and the availability of that theory is waived.

[8]We treat as a single argument Patsos's separate contentions that the facts giving rise to his claims were "inherently unknowable" and that material issues of fact exist as to when he knew or should have known that he had suffered injuries for which he might seek redress. *Williams* v. *Ely*, 423 Mass. 467, 470 n.7 (1996) (the "inherently unknowable" standard is no different from and is used interchangeably with the "knew or should have known" standard).

[9]General Laws c. 260, § 12, provides: "If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."

with the motion judge[10] that there was nothing "inherently unknowable" about the information supplied by First Albany in its monthly statements. The discovery rule provides that a cause of action for the redress of an "inherently unknowable" wrong does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known, of the factual basis for a cause of action. See *Williams* v. *Ely*, 423 Mass. 467, 473 n.7 (1996); *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983); *Maggio* v. *Gerard Freezer & Ice Co.*, 824 F.2d 123, 130 (1st Cir. 1987). The First Albany statements that Patsos received in 1988 and 1989 indicated that a number of checks "issued by Boston" were categorized as "debits" from his accounts. If Patsos did not understand the statements, as he claims, in the exercise of reasonable diligence he could have demanded an explanation from Accomando and sought further explanations from First Albany if Accomando's dismissals were not satisfactory to him. Cf. *Olsen* v. *Bell Tel. Labs., Inc.*, *supra* at 175, and cases cited.

The Appeals Court correctly recognized, however, that his second claim has merit. Where compliance with a statute of limitations is at issue, "factual disputes concerning when a plaintiff knew or should have known of his cause(s) of action are to be resolved by the jury." *Riley* v. *Presnell*, 409 Mass. 239, 247 (1991). To avail himself of the protection of G. L. c. 260, § 12, therefore Patsos must set forth facts from which a jury reasonably could find that a fiduciary relationship existed between himself and First Albany, and that First Albany breached its fiduciary duty to disclose to him adequate information that would have apprised him that his funds had been converted. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 519 (1997) ("[w]here a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying [G. L. c. 260,] § 12").[11] First Albany asserts that as a matter of law there was no fiduciary relationship between the

---

[10]Because the Appeals Court reversed the entry of summary judgment based on Patsos's second argument, it did not reach the issue whether the claims were inherently unknowable.

[11]The Appeals Court correctly recognized that the statutes of limitations governing Patsos's claims would not begin to run until he received "actual knowledge" (from government agents in late 1994 or early 1995) of the facts giving rise to his causes of action, so long as he can demonstrate that First

parties, and that even if there were, First Albany met its fiduciary duty to Patsos by sending him monthly account statements that disclosed all material information.[12]

We consider first whether a jury reasonably could find that the relationship between First Albany and Patsos was fiduciary in nature. Relying on *Vogelaar* v. *H.L. Robbins & Co.*, 348 Mass. 787 (1965), the motion judge concluded that under Massachusetts law there was no fiduciary relationship between Accomando or First Albany and Patsos.[13] Her ruling is consistent with the decisions of several Federal courts that interpreted *Vogelaar* to hold that, under Massachusetts law, a "simple" broker-customer relationship is not fiduciary in nature, even if a broker has encouraged the trust of an unsophisticated customer. See, e.g., *Lefkowitz* v. *Smith Barney, Harris Upham & Co.*, 804 F.2d 154, 155 (1st Cir. 1986) (allegations of customer's minimal knowledge of investments and reliance on account executive who also was close personal friend insufficient to warrant finding of fiduciary relationship because "a simple stockbroker-customer relationship does not constitute a fiduciary relationship in Massachusetts"); *Cannistracci* v. *Dean Witter Reynolds,*

---

Albany became his fiduciary and breached its duty of disclosure. *Patsos v. First Albany Corp., supra* at 272, quoting *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 519 (1997) ("An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G. L. c. 260, § 12").

[12]The affidavit of the defendant's general counsel and vice-president filed in support of the defendant's motion for summary judgment states that the monthly statements sent to Patsos contained "[n]o false or erroneous information," and that First Albany "expected that its customers would communicate promptly with it concerning any problems or disagreements which they had with their statements as rendered."

[13]In *Vogelaar* v. *H.L. Robbins & Co.*, 348 Mass. 787 (1965), the plaintiff, an administrator of the estate of a deceased investor, asserted that the defendant stockbrokers breached their fiduciary duty to the investor when they engaged in self-dealing. We held that the plaintiff's "very general" allegations that (1) the brokers were aware that the investor knew little about the securities business and had received intermittent psychiatric treatment; (2) the investor had "completely relied" on the brokers; and (3) the defendant had transferred funds for investment only in "good and safe" securities, "f[e]ll short of indicating a fiduciary (as distinguished from a business) relationship . . . ." *Id.* We sustained a demurrer because the allegations did not "set out with precision . . . facts concerning the defendants' undertaking or the circumstances of particular transactions and arrangements" sufficient to prove a fiduciary relationship. *Id.* We also allowed the plaintiff to amend the complaint because it was not "clear that the plaintiff cannot state a [claim of fiduciary duty] good against demurrer." *Id.*

*Inc.*, 796 F. Supp. 619, 622 (D. Mass. 1992) (same); *McIntyre* v. *Okurowski*, 717 F. Supp. 10, 11 (D. Mass. 1989) (same). For reasons we shall describe, however, we agree with the Appeals Court that, based on Patsos's affidavit and all favorable inferences drawn from it, a jury would be justified in finding that a "full relation of principal and broker" between Accomando and Patsos came into existence, and with it a general fiduciary relationship between First Albany and Patsos. *Patsos* v. *First Albany Corp.*, *supra* at 271, quoting *Berenson* v. *Nirenstein*, 326 Mass. 285, 289 (1950).

As the Appeals Court noted, prior to the *Berenson* decision, whether a broker-customer relationship was a fiduciary relationship or a business relationship "had a varied history in Massachusetts."[14] *Patsos* v. *First Albany Corp.*, *supra* at 270-271. There, we recognized a distinction between a "mere engagement to buy in behalf of another without more," and an arrangement where the conduct of the parties established "the full relation of principal and broker," thus giving rise to fiduciary obligations. *Berenson* v. *Nirenstein, supra* at 289. We held that a fiduciary relationship came into existence where a stockbroker had approached an investor, offered to serve as his agent in a purchase of shares in a company, and represented that he was in a unique position to negotiate the purchase. *Id.* This was in accord with our earlier decision in *Birch* v. *Arnold & Sears, Inc.*, 288 Mass. 125, 129, 136 (1934), in which we held that, where a customer was "densely ignorant of matters relating to the making of investments" and entrusted her life savings to a broker who knew she was an inexperienced investor and induced her reliance, a broker-customer relationship was "one of trust and confidence" as opposed to one "which ordinarily exist[s] between a broker and his customer."

Read together, *Vogelaar, Berenson*, and *Birch* recognize that in Massachusetts a relationship between a stockbroker and a customer may be either a fiduciary or an ordinary business relationship, depending on whether the customer provides sufficient evidence to prove "a full relation of principal and

---

[14]In *Berenson* v. *Nirenstein*, 326 Mass. 285, 288 (1950), this court resolved two conflicting lines of pre-1950 cases concerning the fiduciary obligations of a party who is engaged to sell or buy property on another's behalf. The court noted that it did not have in mind the existence of a "full relationship of principal and broker" in the line of cases holding that no fiduciary duty arose, and that the relation between the parties in those cases "was substantially different from that ordinarily obtaining between principal and broker."

broker." Because there remain ambiguities as to circumstances that may give rise to a "full relation of principal and broker" and its concomitant fiduciary obligations, we suggest considerations relevant to that determination.

Courts in other States have not been of single mind whether fiduciary duties inhere in every relationship between a stockbroker and his customer. Some have suggested that the resolution of that question turns on whether the broker and customer deal at arm's length. See, e.g., *Banca Cremi, S.A.* v. *Alex Brown & Sons*, 132 F.3d 1017, 1038 (4th Cir. 1997) (under Texas law, a stockbroker can be a fiduciary to a customer where "the relationship between [the] broker and its customer is that of principal and agent," but not where the parties "conducted their business at arm's length in a principal-to-principal relationship"); *Dinsmore* v. *Piper Jaffray, Inc.*, 593 N.W.2d 46-47 (S.D. 1999) ("While a fiduciary relationship does exist between [stock]brokers and their [customers], fiduciary duties are not owed when the parties are dealing at arm's length . . . [and] . . . arise only when one undertakes to act primarily for another's benefit"). Other courts have suggested that a broker always owes his customer some fiduciary obligations. See, e.g., *Romano* v. *Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987), cert. denied, 487 U.S. 1205 (1988) (under Federal securities law, "a broker does owe his client a fiduciary duty"); *O'Malley* v. *Boris*, 742 A.2d 845, 849 (Del. 1999) (because the relationship between a customer and stockbroker is that of principal and agent, the broker, as agent, has a fiduciary duty to carry out the customer's instructions promptly and accurately).

There is general agreement, however, that the scope of a stockbroker's fiduciary duties in a particular case is a factual issue that turns on the manner in which investment decisions have been reached and transactions executed for the account. See, e.g., *Romano* v. *Merrill Lynch, Pierce, Fenner & Smith, supra* at 530 ("the nature of the fiduciary duty owed will vary, depending on the relationship between the broker and the investor"); *Hill* v. *Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 824 (10th Cir. 1986) (broker generally owes fiduciary duties to customer because broker is customer's agent, but scope of duties turns on nature of broker's responsibilities because agent is only fiduciary within scope of agency); *Paine, Webber, Jackson & Curtis, Inc.* v. *Adams*, 718 P.2d 508, 516-517 (Colo. 1986)

(fiduciary nature of a stockbroker-customer relationship is a factual issue that turns on a number of factors).

In determining the scope of the broker's fiduciary obligations, courts typically look to the degree of discretion a customer entrusts to his broker. Where the account is "non-discretionary," meaning that the customer makes the investment decisions and the stockbroker merely receives and executes a customer's orders, the relationship generally does not give rise to general fiduciary duties. See, e.g., *Independent Order of Foresters* v. *Donaldson, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940- 941 (2d Cir. 1998) ("Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker-customer relationship. . . . [A general fiduciary] duty can arise only where the customer has delegated discretionary trading authority to the broker"). See also *Carr* v. *CIGNA Secs., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996); *Greenwood* v. *Dittmer*, 776 F.2d 785, 788 (8th Cir. 1985). For nondiscretionary accounts, each transaction is viewed singly, the broker is bound to act in the customer's interest when transacting business for the account, but all duties to the customer cease "when the transaction is closed." *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 952-953 (E.D. Mich. 1978), aff'd, 647 F.2d 165 (6th Cir. 1981).[15] See *Hill* v. *Bache Halsey Stuart Shields, Inc.*, *supra* at 824 (in nondiscretionary accounts broker owes only a narrow duty not to make unauthorized trades).

Conversely, where the account is "discretionary," meaning that the customer entrusts the broker to select and execute most if not all of the transactions without necessarily obtaining prior approval for each transaction, the broker assumes broad fiduciary obligations that extend beyond individual transactions. See, e.g., *Carr* v. *CIGNA Secs., Inc.*, *supra* at 547 ("The general

---

[15]In *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 952 (E.D. Mich. 1978), aff'd, 647 F.2d 165 (6th Cir. 1981), the court suggested that duties associated with a nondiscretionary account include (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer.

rule . . . is that a broker is not the fiduciary of his customer unless the customer entrusts him with discretion to select the customer's investments"); *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* at 953.[16] But see *Romano* v. *Merrill Lynch, Pierce, Fenner & Smith, supra* at 530 (there is no "bright-line" distinction between the fiduciary duty owed customers in discretionary as opposed to nondiscretionary accounts). Trading by the broker without the customer's prior approval suggests that an account is discretionary,[17] while frequent communications between the parties about the prudence of various transactions may support a finding that a customer has retained control of his account. *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* at 954. If a broker has acted as an investment advisor, and particularly if the customer has almost invariably followed the broker's advice, the fact finder may consider this as evidence that the relationship is discretionary. *Leboce, S.A.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.2d 605, 607-608 (9th Cir. 1983). Courts have looked to both the documentation of the customer's account, as well as to the execution of particular account transactions, to determine whether the customer has entrusted a broker to manage his investments for his benefit. *Paine, Webber, Jackson & Curtis, Inc.* v. *Adams, supra* at 516.

Other factors may also support a finding that a stockbroker has assumed general fiduciary obligations to a customer. A customer's lack of investment acumen may be an important consideration, where other factors are present. See, e.g., *Broomfield* v. *Kosow,* 349 Mass. 749, 755 (1965); *Birch* v. *Arnold & Sears, Inc.,* 288 Mass. 125, 129, 136 (1934); *Romano* v. *Merrill*

---

[16]In *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* at 952-953, the court described the broader duties associated with a discretionary account: (1) to manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history; (2) to keep informed regarding the changes in the market that affect the customer's interest and act responsively to protect those interests; (3) to keep the customer informed as to each completed transaction; and (4) to explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged.

[17]If at the commencement of a relationship the account is nondiscretionary (by written or oral agreement) but the stockbroker subsequently takes over control of account transactions, the trier of fact may still find that the broker assumed the fiduciary obligations associated with a discretionary account. See *Paine, Webber, Jackson & Curtis, Inc.* v. *Adams,* 718 P.2d 508, 516 (Colo. 1986).

*Lynch, Pierce, Fenner & Smith, supra* at 530, citing *Clayton Brokerage Co.* v. *Commodity Futures Trading Comm'n,* 794 F.2d 573, 582 (11th Cir. 1986) (trier of fact must consider "the degree of trust placed in the broker and the intelligence and personality of the customer"); *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* at 953, 954 (where customer is particularly young, old, or naive with regard to financial matters, courts are "likely" to find that broker assumed control over account). An inexperienced or naive investor is likely to repose special trust in his stockbroker because he lacks the sophistication to question or criticize the broker's advice or judgment. *Paine, Webber, Jackson & Curtis, Inc.* v. *Adams, supra* at 517. This may be particularly true where the broker holds himself out as an expert in a field in which the customer is unsophisticated. See, e.g., *Burdett* v. *Miller,* 957 F.2d 1375 (7th Cir. 1992); *Paine, Webber, Jackson & Curtis, Inc.* v. *Adams, supra* at 517, citing *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Boeck,* 127 Wis. 2d 127, 145-146 (1985) (Abrahamson, J., concurring) ("[B]y gaining the trust of a relatively uninformed customer and purporting to advise that person and to act on that person's behalf, a broker accepts greater responsibility to that customer"). Social or personal ties between a stockbroker and customer may also be a consideration because the relationship may be based on a special level of trust and confidence. *Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra* at 954.

We have considered these and similar facts relevant to determining the scope of duty that extends to a customer. *Broomfield* v. *Kosow, supra* at 755 ("review such factors as the relation of the parties prior to the incidents complained of," as well as "the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge"). But we have also held that a business relationship between a broker and customer does not become a general fiduciary relationship merely because an uninformed customer reposes trust in a broker who is aware of the customer's lack of sophistication. See *Snow* v. *Merchants Nat'l Bank,* 309 Mass. 354, 360-361 (1941) (bank that conducted hundreds of securities transactions for elderly widow uninformed in financial matters could not reasonably have been considered to have acted as fiduciary because customer's mere trust or reliance not enough to establish a fiduciary relationship). Cf.

*Broomfield* v. *Kosow, supra* at 755 (catalyst in transformation of business relationship into fiduciary relationship is defendant's knowledge of plaintiff's reliance upon him). In this respect, as others, our law is consistent with other States. See, e.g., *Hill* v. *Bache Halsey Stuart Shields, Inc., supra* at 824 ("A fiduciary duty . . . cannot be defined by asking the jury to determine simply whether the principal reposed 'trust and confidence' in the agent").

In setting out these factors, we recognize that the factual inquiry in each case must be guided by two potentially competing considerations: the need to protect customers who relinquish control of their brokerage accounts, and the need to ensure that securities brokers — particularly those who merely execute purchase and sell orders for customers — not become insurers of their customers' investments. Assigning general fiduciary duties only to those stockbrokers who have the ability to, and in fact do, make most if not all of the investment decisions for their customers properly provides appropriate protection only for those customers who are particularly vulnerable to a broker's wrongful activities.

If Patsos had merely alleged "in very general terms" that he trusted Accomando, that Accomando was aware of his inexperience, and that he had transferred funds for Accomando to invest on his behalf, that would be insufficient to establish that Patsos and Accomando had entered into a general fiduciary relationship. See *Vogelaar* v. *H.L. Robbins & Co.*, 348 Mass. 787, 787-788 (1965). But here, as the Appeals Court correctly noted, Patsos "set out with precision" in his affidavit uncontested statements that, if true, would permit a jury reasonably to find that Accomando's relationship with Patsos was not a business relationship but a "full relation of principal and broker" giving rise to general fiduciary obligations. *Patsos* v. *First Albany Corp.*, 48 Mass. App. Ct. 266, 273 (1999). Those include that (1) Patsos lacked sophistication and experience as a securities investor; (2) a reasonable inference can be drawn that Accomando had significant investment experience and specialized knowledge about private securities transactions; (3) Accomando was aware of Patsos's inexperience as an investor, and encouraged Patsos to rely on his investment expertise by promising financial benefits, favorable margin treatment, and private stock sales; (4) Accomando was in "complete control" of the Patsos accounts; (5) Accomando told Patsos that he was conducting transactions

solely for his benefit; (6) Accomando selected and executed transactions in the accounts without the prior knowledge of or authorization from Patsos; (7) Accomando and First Albany did not provide Patsos written confirmation of stock transactions worth $1.75 million in March or April, 1989; and (8) when questioned, Accomando assured Patsos that he need not worry about his inability to understand the monthly statements or the terms of the customer agreement.

We also agree with the Appeals Court that, if a jury find that Accomando assumed broad fiduciary obligations to Patsos, as they may, First Albany may be held liable for Accomando's wrongful conversion of Patsos's funds under established principles of agency law. See *Patsos* v. *First Albany Corp.*, *supra* at 272, citing Restatement (Second) of Agency § 261 comment a (1958) (liability of principal results if "the agent's position facilitates . . . the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him"). See also Restatement (Second) of Agency § 261 (1958) ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud"); *id.* at comment a (liability of principal results even where the principal is entirely innocent, has received no benefit from the transaction, and where the agent has acted solely for his own purposes).

We next consider First Albany's contention that, even if it owed a general fiduciary duty to Patsos, it met any duty of disclosure because its monthly statements correctly informed Patsos that checks for specified amounts were issued on specified dates, and debited to his accounts. We agree with the Appeals Court that a jury justifiably may find that the monthly statements bearing the description "issued by Boston" constituted a failure to disclose adequately facts that would give rise to Patsos's knowledge of Accomando's embezzlement. *Patsos* v. *First Albany Corp.*, *supra* at 272. While First Albany insists that the monthly statements are sufficiently clear on their face to disclose all necessary facts to its customer, where (i) First Albany's headquarters are in Albany, New York, (ii) stock purchases would in the ordinary course of business be paid from the customer's account, and (iii) Accomando told Patsos "not to worry" when he said that he did not understand the

monthly statements, it is impossible to reach that conclusion as a matter of law.[18] The tolling provisions of G. L. c. 260, § 12, would be available to Patsos were a jury to conclude that the monthly statements did not satisfy First Albany's duty of disclosure. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 519 (1997).

We turn finally to First Albany's argument that summary judgment is proper because Patsos did not raise timely objections to the monthly statements as required by the terms of its "customer's agreement" with him,[19] thereby waiving his right to object to them years later. We subscribe to the conclusion of the Appeals Court that, "[i]f we assume, as we must, that the plaintiff's funds on deposit with the defendant were secretly converted to the personal use of Accomando and that the plaintiff had no knowledge of the embezzlement until the FBI interview early in 1995, then the plaintiff's failure to object within ten days of each of the defendant's statements in 1988 and 1989 was the direct result of the defendant's alleged fraudulent concealment of the embezzlement, and the ten-day notice provision would not bar the plaintiff's action." *Patsos* v. *First Albany, Inc.*, *supra* at 273.[20] We add to this two further observations. First, when he signed First Albany's customer's agreement in April, 1988, Patsos was told by Accomando that he need not read or understand it, and that the document contained "mere formalities." Second, at an unspecified later date, Patsos did what the customer agreement required — he questioned Accomando about the transactions and the terms of the monthly statements — and he was told "not to worry."

Because of our conclusions, we need not reach the merits of

---

[18]Even if Patsos had read the statements and gleaned from them that First Albany had issued checks withdrawing money from his accounts without his authorization, the statements do not reveal the payees of the checks or the reasons that checks have been issued. A jury could reasonably find that an inexperienced investor might understand that some "debits" represented checks drawn in the Boston office to pay the Albany office for the purchase of securities for his accounts.

[19]Patsos and his nominees each signed individual copies of the First Albany form agreement between March 7 and April 6, 1988. The fourteenth provision of each agreement requires that "statements of the accounts of the undersigned shall be conclusive if not objected to in writing [by the investor] . . . within ten days."

[20]Because she concluded that, as a matter of law, there was no fiduciary relationship between Patsos and First Albany, the motion judge did not reach this issue.

Patsos's argument that the customer agreement was an unenforceable contract of adhesion. The judgment for First Albany is vacated. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*