Fahey, J.
Plaintiff brought this action claiming that in the course of selling plaintiff a “universal life” insurance policy from Midland National the defendant breached his contract with the plaintiff (Count One), was negligent (Count Two), and intentionally and fraudulently misrepresented the nature of the policy and resulting benefits (Count Three and Four), all in violation of G.L.c. 93A (Count Five).
The defendant now seeks summary judgment on all counts on the grounds that 1) the plaintiffs claims are barred by all applicable statutes of limitations: and 2) and there was no implied or oral contract between the parties.
For the following reasons, Defendant’s Motion for Summary Judgment is ALLOWED.
FACTS
The facts are gathered from both the plaintiffs 9(a)(b)5 response and the admitted facts from defendant’s statement of facts.
The plaintiff, Barrie Clough, is now 57 years old. He graduated from Needham High School in 1961. He worked for a moving company after high school. From 1966-78 Clough worked for the United States Postal Service (“USPS”). From 1978 to 1988 Clough was the Postmaster for Dover. From 1988 to 1998 he was postmaster of the town of Medfield. He supervised 16 employees in Dover and 33 employees in Medfield. From 1998 to present, Clough has held the position of Dover Town Clerk. Although Clough has taken no business courses since 1961, part of his job function as postmaster was to make purchases; his courses included some financial training.
Prior to meeting Brown, Clough knew that in order to buy life insurance with greater benefits he would have to pay more money. Clough had life insurance as a benefit through his positions at the USPS to which he contributed partially. With reference to Clough’s life insurance policies obtained through the USPS, he understood that the amount of coverage could be increased if he contributed more.
In May of 1986, Clough had three other life insurance polices which had a combined cash value of approximately $12,000.00. Clough paid annual premiums of about $600.00 for those other polices. At the time of his purchase of the policy from Brown, Clough was interested in retirement planning.
Prior to May 1986, Clough did not know Brown. Clough does not remember the exact date of his first conversation with Brown, or how many times he and Brown met. He assumes it was prior to June when he bought the policy. Clough and Brown met at Clough’s home. There were no other participants except Clough and Brown.
Brown gave Clough a brochure entitled “Universal Life Questions and Answers.” (Ex. 10.) Clough put the brochure in a file, possibly after reading it. He did not study the brochure. Clough understood that he was obligated according to all the terms and conditions of the policy even if he had not read the whole document. He read the G.L.c. 93A letter and complaint prepared by his attorney and confirmed the allegations in those documents to the best of his knowledge or ability.
Even though Clough claims he did not understand the issues raised in the brochure in 1986, Clough did not ask Brown to explain the brochure at any time.[1] When Brown met with Clough at Clough’s home, Brown gave him a Financial Planning Memorandum (the “Proposal”).
The Proposal contained a “Proposed Program” with two (2) alternatives:
Solution A
1. Purchase $200,000 of additional life insurance with deposit of $12,900 1st year and $900 for the next 20 years.
2. Total deposits over 20 years, equals $30,000.
3. Just 5 years of additional pension at $5,637 /year equals $28,185.
4. The $200,000 of additional life insurance is completely paid up at age 62.
Solution B
Deposit into a side fund a total annuity value of $71,000 today to bring the retirement planning of Lorraine to pay her retirement benefits.
*177 Clough told Brown that he could not afford the $900.00 annual premium and he did not want to pay $900.00 per year, thus rejecting both Solution A and Solution B. Brown then said “How about if I can show you how to do this for nothing with your present policies?" Brown said to him that he could pay the $600.00 annual premiums and get the results of Solution A; i.e. a paid-up policy by the age of 62 by “taking some of the initial money out of the cash value of the policies [he already had] and put it into a mutual fund." Brown also told him that “You will never have to pay a policy. The mutual fund should support the policy.” (Clough p. 165, lines 12-16.) Clough wanted to hear that he would get something for nothing. (Clough p. 168.)
As a result of Brown’s assurances, Clough used $7,000.00 of the $12,900.00 of cash value he had in his three (3) life insurance policies as the initial payment on the Policy and Brown put the remainder, $5,000.00, into a John Hancock mutual fund. (Clough, pp. 165-66.) Clough withdrew $600.00 per year from his John Hancock Tax-Exempt Income Trust (Ex. 14) (Admission Nos. 6 and 7) and used that to pay the $600.00 annual premium on the Policy. (Clough, pp. 166-67.)
Clough understood from Brown that an annual premium payment of $600.00 instead of $900.00 and an initial payment of $7,000.00 instead of $12,900.00 would still give him what he wanted: a paid-up policy at age 62. (Clough pp. 167, 173, and 176-77.)
However, Clough also admits that he knew in 1986 when he purchased the policy that paying an annual premium of $600.00 instead of $900.00 would reduce the cash value of the Policy. (Admission No. 30.) Brown also told Clough that the lower annual premium of $600.00 instead of $900.00 would only impact the cash value of the Policy and it would not impact the death benefit. (Clough pp. 171-72 and 175; Ex. 2, Complaint para. 11.)
Brown gave Clough illustrations (Exs. 5 and 12) upon which Clough relied in making his purchase. (Clough pp. 178, 179.)
Once the policy was in effect, Clough received the Annual Reports and “scanned them over” (Clough, p. 93, line 23) but he did not read every word. (Clough, pp. 94; 108, line 20; 109; 112, line 22.) Clough admitted that he would look at the death benefit in each annual report. The death benefit written at the top of the report was always $200,000.00 plus the cash value of the Policy. (Clough, p. 26.) Clough denied understanding that the columns on the annual reports entitled “monthly charges” were amounts that Midland National was charging him. (Clough, p. 114, line 115; and p. 115, lines 1-6.) Clough admits that he did not perform any calculations from 1986 to 1994 as to the numbers which appeared in the annual reports to determine if the numbers were added or subtracted from his policy. (Admission No. 20.)
Clough probably noticed in the June 1995 Annual Report that the cash value had gone down from the year before but he “would have fluffed it off as interest.” (Clough, p. 126, line 6.) The decrease in the cash value did not prompt him to call either Brown or Midland because he believed the cash value of the policy was not related to the contract fund. (Clough, p. 126, lines 8-23.) Clough admits that it did not matter to him that the death benefit fluctuated so he did not ask why that was so nor did he notice the “insurance” amount increased annually. (Admission Nos. 21 -24.) Clough never called Brown to ask him any questions about the Annual Report.
It meant nothing to Clough that the total insurance premium he was charged in 1997, $1,290.48, was more than twice the amount he paid in the annual premium, $600.00. (Clough p. 132.) Clough did not know in 1986 or at present that the interest was paid on the cash value of the Policy (Clough, pp. 151-53, line 3) (Brown pp. 97, 112), that is calculated and earned according to whatever the cash value was of the policy. Clough had “no idea” as to the mechanism that would result in his Policy becoming “self-sustaining.” (Clough, pp. 154, 156, line 3.)
Clough claims that prior to the summer of 1997, when he called Midland, he did not know that monthly charges were charged to his policy. He also claims he learned at that time that, to get a self-sustaining policy, he had to have paid a higher premium than the $600.00 per year he had been paying. After receiving a letter from Midland, dated October 24, 1997, he learned that the $600/year premium would not give him a paid up, $200,000 life insurance policy by age 62.
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving parly to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983), Mass.R.Civ.P. 56(c) (West 2000). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and showing that the summaryjudgment record entitles it to judgment as matter of law. Pederson v. Time Inc., 404 Mass. 14, 16-17 (1989); Flesner v. Technical Communications Corp., 410 Mass 805, 809 (1991); accord Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, 404 Mass. at 17. A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence *178 negating an essential element of the nonmoving party’s case or by showing that the nonmoving party is unlikely to submit proof of that element at trial. Kourouvacilis, 410 Mass. at 714. ”[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts alone to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
Statute of Limitations
Defendant argues the case has been filed too late. Discussions regarding the policy occurred in May of 1986 and the policy was issued in June 1986. Misrepresentations, if any, were made at that time. This action was filed on March 13, 2000, 14 years too late according to the defendants. The defendants also argue that Clough was “stubbornly ignorant” in the purchase and monitoring of his investment in this policy. He never asked questions or reviewed the policy or annual statements.
Plaintiff counters that argument with the contention that the statute of limitations did not begin to run until April 1997, when the plaintiff learned that he had not received a $200,000.00 death benefit policy that would be paid up at age 62 even though he had only invested approximately $20,000.00 in it. The plaintiff claims that because the true nature of the insurance policy and the consequences of his choice and method of funding the policy were “inherently unknowable,” the tolling provision of the discovery rule should apply.
”[T]he discovery rule . . . arise[s] in three circumstances: where a misrepresentation concerns a fact that was ‘inherently unknowable’ to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive.” Patsos v. First Albany Corp., 433 Mass. 323, 328 (2001).
An inherently unknowable wrong does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known, of the factual basis for a cause of action. Id. at 329. Where there are factual disputes concerning when a plaintiff knew or should have known of his cause(s) of action, they are to be resolved by a jury. Id. at 329. To defeat defendant’s motion for summary judgment, Clough must set forth facts from which a jury could find that he did not know and could not have known that he did not get a $200,000 death benefit insurance policy that would be paid up at age 62 until 1997, despite the brochures, the proposal, the illustrations, and the annual statements. Clough has simply alleged ignorance. Here, Clough could have sought explanations at any time regarding his annual statements as easily as he sought information from Midland in 1997. An insured cannot abandon all responsibility for ascertaining the terms of coverage that his broker obtains. Campione v. Wilson, 422 Mass. 185, 196 (1996).
The discovery rule also arises where a wrongdoer breaches some duty of disclosure. However, the relationship between insurance broker and the insured is not normally fiduciary, absent special circumstances of assertion, representation, and reliance. Baldwin Crane & Equip. Corp. v. Riley & Rielly Ins. Agency, Inc., 44 Mass.App.Ct. 29, 32 (1997). The nature and extent of the duty of care owed by an independent insurance agent to his client depends in part, at least, upon the degree of skill which he represents himself to possess. Here, Brown did not have a long-term, involved relationship with Clough. The evidence shows that he only sold Clough a one-time insurance policy.
CONCLUSION
Because the statute of limitations has not been tolled, the plaintiffs action is untimely. Accordingly, summary judgment is appropriate.
ORDER
For the foregoing reasons, Defendants’ Motion for Summary Judgment is ALLOWED.

 The brochure has a list of “frequently asked questions” and answers such as:
Q. Will I ever Need to Purchase Another Policy?
A. Probably not. The flexibility of Universal Life allows you to adjust it to most changing economic and family situations. It may be the only policy you’ll ever need.
Q. Is the Interest Rate Guaranteed?
A. Yes. The guaranteed rate is 4[1]/2%. However, a currently higher non-guaranteed rate of interest will be credited.
Q. How flexible are my premiums?
A. After the initial premium, you can make yoiir payments in any amount. There is no required premium payment— you can even defer payments.
Q. What are my death benefit options?
A. Unlike traditional life insurance, Universal Life allow you to pick between two death benefit options:
Option One . . . If you choose this option, your total death benefit is the specified amount, which includes the cash value.
Option Two . . . With this option, your total benefit is the specified amount you selected, plus the cash value.
Of special note:
Q. How does my cash value accumulate?
A. Your initial payment, after deducting protection costs and expenses, goes into your Contract Fund accumulation. Every dollar in your fund earns the current high interest rate. Universal Life provides greater benefits for the owner who retains the policy to fully serve its intended purposes — long-range protection, financial planning and the accumulation of personal worth. There are no “front-end” expenses, and surrender charges affect only the policyholder who terminates coverage during the first 15 years. This means more of the premium in all policy years contributes to cash value growth, to create the largest accumulation possible at the competitive interest credits.