In re John F. MURPHY, Jr., Debtor.

John Moore and Melanie
Moore, Plaintiffs,

v.

John F. Murphy, Jr., Defendant.

Bankruptcy No. 01–41211–HJB.
Adversary No. 01–4181.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 28, 2003.

Gary W. Cruishank, Boston, MA. for Debtor.

Kristyn E. Moran, Lawson & Weitzen, LLP, Boston, MA, Plaintiffs.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court is an "Amended Complaint for Determination that Debt is Nondischargeable" filed by plaintiffs John Moore ("Mr. Moore") and Melanie Moore ("Ms. Moore") (jointly the "Plaintiffs") against the debtor/defendant, John F. Murphy, Jr. (the "Debtor"). The Plaintiffs maintain that a $764,507.08 [1] default judgment (the "Judgment") entered in their favor against the Debtor in an arbitration proceeding (the "Arbitration") before the National Association of Securities Dealers

---

1. The original amount of the Judgment entered by the NASD Arbitration Panel was a total of $729,511.18. The Judgment was later affirmed by the District Court for the District of Massachusetts (the "District Court"), with an added interest at 12% per annum in the amount of $33,817.44, and costs in the amount of $1,178.46. In this Memorandum of Decision, the NASD Judgment, in the amount affirmed in the District Court Judgment (Ex. 15), shall be referred to generally as the "Judgment."

(the "NASD") is nondischargeable, pursuant to 11 U.S.C. § 523(a)(4), as a debt arising out of the Debtor's defalcation while acting in a fiduciary capacity. The Plaintiffs further maintain that principles of *res judicata* bar this Court's determination of the dischargeability of the debt underlying the Judgment.

For the reasons set forth below, the Court finds that *res judicata* does not bar this Court's independent determination of the dischargeability of the debt owed to the Plaintiffs. Additionally, upon review of the evidence adduced at trial and the entire record in this matter, the Court agrees that the debt represented by the Judgment is nondischargeable, but only to the extent of $174,716.81.

## I. FINDINGS OF FACT

Plaintiff, Ms. Moore, testified at trial. The Debtor was represented at trial, but neither testified nor presented witnesses. The following constitute the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr.P. 7052, based on Ms. Moore's testimony, both on direct and on cross-examination, and the exhibits admitted into the record.

Ms. Moore is a practicing attorney concentrating in corporate capital market transactions. She also holds a degree in accounting and an L.L.M. degree in taxation. (Trial Transcript at 13 (hereinafter "TT").) Her husband and co-plaintiff, John Moore, also holds a law degree and is currently employed as legal counsel in the investment firm of Goldman Sachs. (TT at 15.) Mr. Moore also holds a Series 7 stockbroker license, which requires knowledge of trading in stocks, options and other investment instruments. (TT at 75.)

In 1996, the Debtor was employed as a stockbroker at Bear Sterns, and, upon the recommendation of an acquaintance, the Plaintiffs solicited the Debtor to serve as their stockbroker. In February of 1997, the Debtor switched brokerage firms and accepted a position as a broker in Janney Montgomery Scott's ("Janney") Boston office. Following the Debtor's move to Janney, the Plaintiffs transferred their funds from Bear Sterns and opened several accounts with Janney, to be serviced by the Debtor. (TT at 16.) The account here at issue is a margin account held jointly by the Plaintiffs, through which they traded stocks and options (the "Account"). Under the standard margin (Form W–9) agreement signed by the Plaintiffs, the securities held in the Account served as collateral for funds borrowed from Janney for the purchase of securities on credit. (Def.Ex. 1.) The agreement contained an arbitration clause binding the parties to bring forth any grievances related to the Account before a NASD arbitration panel (the "Panel"). *Id.* Also, prior to trading in options, the Plaintiffs signed an agreement with Janney, which included an acknowledgment that Janney had explained the risk of investing in options and that the Plaintiffs fully understood that risk.[2] *Id.*

All of the Plaintiffs' communications with the Debtor throughout the duration of their business relationship were by telephone; the Plaintiffs never personally met with the Debtor. At the time of their first contact, the Plaintiffs resided in New

---

**2.** The option agreement form was signed by both Mr. and Ms. Moore on November 21, 1997 and contains the following statement: I understand that the trading of options is not suitable for everybody and I have been advised by representatives of [Janney] of the inherent financial risks of trading Options and I fully understand these risks. I further understand that the Option Market is a highly leveraged form of investment and as such contains a relatively high degree of risk.
(Def.Ex. 1.)

York. However, in August of 1997, they relocated to Hong Kong. (TT at 19.) Notwithstanding that move, the Plaintiffs continued trading in the Account and communicating with the Debtor by telephone. (TT at 20.)

Communications regarding trades in the Account were conducted primarily between the Debtor and Ms. Moore, who kept close watch over activity in the Account. Ms. Moore would telephone the Debtor several times a day, usually two to three times a day, to keep abreast of daily market performance and to discuss trading strategies. (TT at 17.) Although Ms. Moore relied on the Debtor's recommendations with respect to the strategies to be employed in the purchase and sale of stocks (TT at 19), the Debtor was instructed to obtain the Plaintiffs' express approval prior to executing any trades for the Account. (TT at 18.)

It was customary for Ms. Moore to keep notes of her conversations with the Debtor. Her notes were comprised of general market information given by the Debtor and notations of trades ordered to be executed. (TT at 21.) Ms. Moore would then use these notes to keep track of the Account and track trade orders to confirmation slips and account statements from Janney. *Id.* She also relied on her notes to keep track of missing confirmations or any outstanding orders. *Id.* Prior to July of 1998, the Plaintiffs encountered no problems in their dealings with the Debtor, nor in activity in the Account. (TT at 20.) Prior to that time, the Plaintiffs also generally received timely trade confirmation slips and monthly account statements. (*Id.*) Commencing in May of 1998, however, the Plaintiffs received trade confirmations and their account statements in a seemingly sporadic fashion. Many trade confirmations were missing and, as a result, the Plaintiffs had difficulty in tracking activity in the Account. (*See* Ex. 4.)

 The Plaintiffs traded in the Account in relatively high volume, with purchases and sales of blocks of the same stocks at differing prices in a manner similar to day trading. (*See* Ex. 2.) One of the stocks traded in this manner was Lycos stock. In April of 1998, the Plaintiffs also began trading in Standard & Poors 100 Indexed options (traded under the ticker "OEX") (the "OEX Options"). The Account statements (the "Statements") reflect that the Plaintiffs traded in OEX Options in a similar fashion, with purchases and sales of the same block of OEX Options at differing prices.[3] (*See id.*) Two

---

3. In his Post–Trial Memorandum, the Debtor objected to the admissibility of the Statements for the truth of the information contained therein, arguing that the requirements of Federal Rule of Evidence ("FRE") 803(6), excepting business records from the hearsay rule, were not met. FRE 803(6) excepts from the hearsay rule:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The Debtor claims that, at trial, the Statements "were admitted without objection as statements that were in the possession of the Plaintiffs. However, the truth of the contents [of the Statements] was not established since [Janney's only testifying representative] did not know how the information gets entered in the computer." (Def. Post–Trial Mem. at 12.)

The trial record reveals, however, that Debtor's counsel raised neither a general nor

transactions in Lycos stocks and four transactions in the OEX Options are the subject of the present dispute.

### A. The Lycos Stock Trades

On July 8, 1998, Ms. Moore received a seemingly routine call from the Debtor. (TT at 21.) During that conversation, the Debtor informed her that she would be receiving confirmation slips for two unauthorized trades in Lycos stock. The trades pertained to 2500 shares of Lycos stock purchased at $97.50 a share and another purchase of 500 Lycos shares at $97.4375 each, both executed on July 7, 1998 (the "Lycos Stock"). (*See* P.Ex. 1.) The Debtor informed Ms. Moore that these two transactions were a mistake and had been cancelled on July 8, 1998, and that Ms. Moore would also be receiving confirmation of their cancellation. (TT at 22.)

The Plaintiffs did receive confirmation for the purchase of the Lycos Stock (Ex. 1) on or about July 15, 1998, but nothing else. *Id.* Upon receipt, Ms. Moore called the Debtor to inform him she had received the purchase confirmations, but not the cancellations. In response, the Debtor informed her that the cancellation slips had been mailed and that she should wait for them.

(TT at 23.) Ms. Moore's inquiries regarding the cancellation slips continued for the next two months, each time with responses from the Debtor in the same vein. The Debtor would inform her that "it ha[d] been taken care of" and that Janney's office was slow in correcting account errors and sending out documentation reflecting the corrections. *Id.*

Relying on the Debtor's repeated assurances that the unauthorized trades had been canceled, the Plaintiffs continued to make trades in the Account. In fact, during the next two months, Ms. Moore instructed the Debtor to make three trades in Lycos stock, which the Debtor confirmed had been executed.[4] (*See* Ex. 10.) However, because the Plaintiffs were now having problems receiving documentation from Janney regarding their trade orders and account activity, they had difficulty tracking activity in the Account. (*See* Ex. 9.) The Plaintiffs never received confirmation slips of those trades and the trades were also not reflected in the monthly account statements when the Plaintiffs did receive them. (*See* Ex. 2, 10.) On September 7, 1998, the Plaintiffs sent a letter to a Kevin Souter of Janney's compliance department complaining of Janney's fail-

---

a limited objection to the admission of the Statements. Objections related to the Statements were raised twice. In his first objection, Debtor's counsel complained that Ms. Moore was testifying about information contained in the Statements prior to their admission into the record. (TT at 25–26.) Later, Debtor's counsel objected to Ms. Moore testifying as to matters set forth in a *summary* of the Statements (Ex. 3), on the grounds that Ms. Moore could not know that the summaries were accurate reflections of information contained in the Statements. (Ex. 16; TT at 27, 57.) Because Ms. Moore sufficiently established her first-hand knowledge of the accuracy of those summaries, those exhibits were admitted over the Debtor's objections. *Id.* But when specifically asked by the Court whether he had any objections to admission

of the Statements themselves, Debtor's counsel replied "I have no objection to the [S]tatements." (TT at 28.) Plaintiffs' counsel never raised an objection to the admissibility of the Statements for the truth of the information contained therein. Where a party fails to timely raise an objection at the time evidence is introduced, the objection is waived. *Shepp v. Roach*, 775 F.2d 452, 454 (1st Cir.1985).

4. These purchase orders were:

7/29/98 purchase of 3,000 Lycos shares at $53.0615 per share.
8/31/98 sale of 6,000 Lycos shares at $28.1250 per share.
9/24/98 purchase of 6,000 Lycos shares at $33.5000 per share.

ure to timely send documentation regarding their account. (Ex. 4.)

By September 16, 1998, Ms. Moore's patience had come to an end. She threatened to file a complaint with Janney's compliance department if the Debtor did not take steps to send confirmation of the purported July 8, 1998 Lycos Stock cancellations. In response, the Debtor faxed to the Plaintiffs, that same day, a computer print-out reflecting that the 2500 shares and 500 shares of Lycos stock had been canceled on July 7, 1998.[5] (Ex. 5.) On the next day, September 17, 1998, the Debtor faxed them a copy of the Lycos Stock purchase confirmations, identical to the confirmation slips the Plaintiffs had already received on July 15, 1998. (Ex. 6.) Printed on the confirmation slips were Janney's logo and Janney's headquarters address in Philadelphia, PA. A computer print-out added onto the document also reflected the address of the branch office in Boston. These purchase confirmations were sent along with identical slips with a computer print-out that read: " *CANCELLED* billing, billing in error." *Id.* The document reflected the "trade date" of July 7, 1998, but did not indicate when the cancellation slips were printed or produced.[6] *Id.*

Ms. Moore was still not satisfied. She demanded a credit for the margin interest charged on the supposedly cancelled Lycos Stock trades. Accordingly, on September 18, 1998, the Debtor sent Ms. Moore another fax of a computer print-out. (TT at 34.) This print-out reflected a "credit interest [adjustment]" in the amount of $998.97 on September 10, 1998. (Ex. 7.) The Statements for those corresponding dates, however, reflect neither the Lycos Stock cancellation nor the interest credit adjustment.[7] (*See* Ex. 2, 4, 9.)

### B. OEX Options

During the relevant period, the Plaintiffs were also trading in OEX and Real-Networks Options. The initial transaction in OEX Options occurred in April of 1998. The Debtor recommended that the Plaintiffs trade in OEX Options, claiming that he had achieved good results in his other clients' portfolios. Ms. Moore had little experience in the trading of options, but the Debtor explained in summary fashion the strategies of option trading. (TT at 54–55.)

Pursuant to this discussion, Ms. Moore agreed to allow the Debtor to execute purchases and sales of OEX Options on the Plaintiffs' behalf. Because Ms. Moore believed that she would have difficulty accessing current information on the market prices for options, she told the Debtor that she would have to rely on him completely for information regarding their prices and the timing of the trades. (TT at 55.) However, the Plaintiffs did set two conditions. First, the Debtor was to confer with the Plaintiffs prior to conducting any OEX trades. Second, OEX trading was to be conducted on a trial basis. If the Debtor demonstrated that OEX trading was

---

5. Among other information reflected in this document, such as dollar amounts credited to the Account from sales of Lycos stock, the Lycos trades are found at the last two entries with a "CXL" notation.

6. It is unclear whether "trade date" reflects the purchase date or the cancellation date of the stocks.

7. Interestingly, all of the other transactions reflected in the two computer print-outs sent by the Debtor on September 16 and 18 directly match with the transactions and dates reflected in the Statements for those corresponding dates. No other transaction reflected in the two computer print-outs seem to be missing or to be disparate from those reflected in the Statements.

consistently profitable, the Plaintiffs would continue with this mode of investment; otherwise, they would cease. (TT at 56.)

Thereafter, consistent with their regular course of dealing, Ms. Moore would regularly ask the Debtor for information on the performance of the options and keep abreast of the Debtor's activities with respect to them. *Id.* Upon her prompting, the Debtor would state that the Account was drawing significant profits on OEX trading. (TT at 56.) According to the Statements, however, the Plaintiffs were in fact incurring losses on those OEX trades.[8] (*See* Ex. 16.)

Upon review of her Statement for May of 1998, Ms. Moore noticed an entry indicating that a block of ten OEX Option contracts had "expired."[9] (TT at 59; *See* Ex. 2, Statement for 4/25/98–5/29/98 at 3.) This was apparently inconsistent with what the Debtor had represented to Ms. Moore about this particular block of contracts, so she called the Debtor to inquire. (TT at 59.) The Debtor's response was that these contracts had never expired. Rather, he explained, they had been "rolled over" into new contracts with later expiration dates. (TT at 60.) A "roll over" is transacted by first selling a block

of contracts close to their expiration date, crediting the sale proceeds into the account, and then using the proceeds to purchase another block of contracts with a later expiration date. At the time, Ms. Moore did not question this explanation, as it was consistent with the Debtor's prior description of the nuances of OEX trading.[10] *Id.* Presumably because the Plaintiffs were not receiving regular account statements at the time, Ms. Moore was unable to verify the truth of this representation.

Ms. Moore subsequently found three other "expired" blocks of OEX Option contracts on three later Statements.[11] As before, Ms. Moore made inquiry with the Debtor, who stated that no contracts had actually expired; they had simply been rolled over into new contracts with new expiration dates. According to Ms. Moore, the Debtor explained that " 'the [Janney] statements [were] misleading, they're inaccurate, and these options were in the money, we rolled them over, cash went into your account, we purchased additional options with a later expiration date.' " (TT at 61.) In response to Ms. Moore's repeated inquiries regarding the purportedly

---

8. According to the Plaintiffs' summary of the Statements, they suffered a net realized loss of $54,215.29 in OEX option trading. (Ex. 16.)

9. An option contract has a market value pegged to the value of the underlying stock. When an option contract reaches its expiration date, it can no longer be exercised and the dollar cost to purchase the contract is lost. Accordingly, an option is said to have "expired worthless" after its set expiration date. On the other hand, a contract that can still be exercised and sold for some amount of cash is said to be "in the money."

10. Indeed, the Debtor's representation was consistent with the general strategy employed in OEX trading for the Account. A review of

the activity in the Statements reveals a high volume of purchases and sales of OEX contracts close to their expiration dates. For each uncontroverted sale reflected in the Statements, a dollar amount is recorded as having been credited to the Account, with corresponding debits for each subsequent purchase of new contracts. (*See* Ex. 2.)

11. The four total expired contracts were:

Ten $535 OEX puts purchased on 4/29/98 expiring 5/16/98 (expired 5/18/98).
Fifteen $540 OEX puts purchased on 6/19/98 expiring 7/18/98 (expired 7/20/98).
Fifteen $545 OEX puts purchased on 8/04/98 expiring 8/22/98 (expired 8/24/98).
Twenty $520 OEX calls purchased on 8/28/98 expiring 9/19/98 (expired 9/21/98).
(Ex. 16.)

expired options, the Debtor offered to prepare a summary profit and loss statement to "show [her] that nothing expired worthless, there were some minor losses with regard to trading these options, but again, nothing expired worthless." *Id.*

On August 20, 1998, the Debtor faxed a self-prepared computer print-out to the Plaintiffs, listing transactions in OEX and RealNetworks options (among other transactions) from April 29, 1998 through August 11, 1998. (Ex. 17.) The print-out listed a block of ten $535 OEX put contracts purchased on April 29, 1998 at $11.25 [12] and a block of fifteen $540 OEX put contracts purchased on June 3, 1998 at $11.50. The summary also showed that both of these option blocks were sold on July 29, 1998 at $10.64, for a net loss of $1,974.42. *Id.* The Statements, however, reflect no sales of OEX options on July 29, 1998.[13] (*See* Ex. 2.) The Court has conducted its own exhaustive review of the Statements, tracking blocks of options purchased and matching them to the sale record for the corresponding "rolled over" blocks of contracts. While this review showed that most contracts did indeed "roll over," the Court was unable to find corresponding sales transactions for the four blocks of contracts which were the subject of Ms. Moore's inquiry.

Even assuming, *arguendo,* that the Statements somehow inaccurately failed to reflect the closing of all of the four positions in question,[14] the Debtor's summary of account independently shows that, at least as to the two blocks of contracts set forth in the Debtor's summary, his representations to Ms. Moore were misleading. More specifically, the Statements show that the block of ten $535 OEX put contracts listed in the summary was purchased on April 29, 1998 with an expiration date of May 16, 1998 (Ex. 2); the block of fifteen $540 OEX put contracts were purchased on June 19, 1998 [15] and had an expiration date of July 18, 1998. *Id.* Simple deductive reasoning leads to the conclusion that these two option blocks could not have been sold on July 29, 1998, as represented on the Debtor's summary, for no reasonable investor would willingly pay $10.64 for an option contract that had absolutely no value and could not possibly ever be exercised.

The discrepancies in the purchase price and number of the option blocks listed on the Debtor's summary, as compared to those actually listed on the Statements, lead to the unmistakable conclusion that the summary was the Debtor's sloppy, haphazard attempt to conceal his negligence (at the very least) in allowing the option contracts to expire. *See, e.g.,* n. 12, 13. Indeed, these discrepancies are indicative of the Debtor's improper management of the Account both as to the Lycos Stock and the OEX Options.

**12.** The Statement for the period 4/25/98–5/29/98 lists two separate purchases of five $535 OEX put contracts purchased at $11.00 and $11.500, respectively, on 4/29/98.

**13.** The Statement for the relevant period reflects only two *purchases* of five and twenty $555 OEX put contracts at $10.75 and $10.6250, respectively, on that date. These positions were closed on August 3, 1998 at $13.00. (*See* Ex. 2, July and August, 1998 statements.)

**14.** A large coincidence, indeed.

**15.** And not June 3, 1998. The Statements show that a single *sale* of fifteen $530 OEX put contracts with an expiration date of 6/30/98 (purchased on June 2, 1998) occurred on June 3, 1998. Interestingly, all other transactions reflected in the summary can be matched to corresponding entries in the Statements on the relevant dates. There are no discrepancies in terms of dates, number of shares bought and sold, or purchase and sale prices.

## C. Liquidation of the Account

On or about September 25, 1998, the Debtor contacted Ms. Moore to advise her that he would be going on his honeymoon at the end of the month and would be out of the office for approximately three weeks. (TT at 36.) He also introduced her to a Cory Krager, another broker at Janney's Boston office, who would be managing the Account in the Debtor's absence. *Id.* During that conversation, the Debtor and Ms. Moore also discussed strategies to be employed for the Account. Because the market at the time was undergoing a downturn, the Debtor discussed hedging strategies such as buying puts on individual stocks or purchases of more OEX Options to maintain the value of the Account. *Id.* Krager was privy to these discussions, and the Debtor assured Ms. Moore that Krager was familiar with these hedging strategies and would be able to execute them competently. *Id.*

■ Upon the Debtor's departure, Ms. Moore contacted Krager, in usual fashion, to discuss activities in the Account. Between approximately September 26 and 29, 1998, Ms. Moore spoke with Krager several times. (TT at 38.) On September 29th, however, Ms. Moore received a faxed note from Robert Cully ("Cully"), branch manger of Janney's Boston office and the Debtor's supervisor. (Ex. 8.) The note stated: "Could you please give me a call today regarding your account at Janney Montgomery Scott." *Id.* In response to this fax, Ms. Moore contacted Cully and discussed matters related to activity in the Account. *Id.* Thereafter, all of her calls to Janney were routed directly to Cully, who informed her that he would be dealing with matters in the Account directly. (TT at 42.) Because the market was in decline, Ms. Moore then informed Cully of her intent to employ the hedging strategies previously discussed with the Debtor. (TT at 65.) Cully, however, refused to allow Ms. Moore to execute those trades. According to Ms. Moore's testimony, Cully stated that "for liability purposes ... I cannot allow you to hedge your positions." [16] (TT at 65.)

**16.** Ms. Moore's full testimony with regard to her communications with Cully was:

> [Cully] asked me if I was aware that my account had suffered a large amount and a large number of losses in both Lycos [stock] and OEX Options .... I told him that there hadn't been any losses that I was aware of .... [Cully said he] noticed that trading in the account had increased dramatically and as a result there were actually quite a number of large losses .... He said because of the unresolved issues in this account related to Lycos trades and the OEX options, he said, "for liability purposes, I can't allow, I cannot allow you to hedge your positions. You can basically hold things or you can sell."

(TT at 40–41; 65–66.)

At trial, this statement was admitted as proof of Ms. Moore's state of mind and her resulting actions. The probative value of that statement for its truth, however, was taken subject to connection with Cully's later testimony on the stand. (TT at 39, 66.) During Cully's testimony, Plaintiffs' counsel never made the connection to Ms. Moore's discussions with Cully. In their Post–Trial brief, the Plaintiffs raise, for the first time, the argument that Ms. Moore's hearsay testimony should be admissible, despite the lack of connecting testimony, under the exception to hearsay under FRE 803(3) to show Cully's state of mind. Specifically, Plaintiffs claim that the statement is not introduced to prove the truth of the matter asserted (to prove that the Debtor did in fact commit an act of defalcation), but rather to show Cully's reason for prohibiting the Plaintiffs from executing any further trades in the Account.

Because the Court did not make a final ruling as to the admissibility of the hearsay declaration regarding Cully's communications with Ms. Moore at trial, the Court will now consider the Plaintiffs' claim of admissibility of the statement under alternate grounds. FRE 803(3) excepts from hearsay:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physi-

Ms. Moore's repeated requests to put hedging strategies in place were to no avail, for Cully repeatedly refused. (TT at 66.) This pattern of discussion took place from September 29, 1998 through October 8, 1998, when the Plaintiffs finally decided to liquidate all of their positions in the Account. (TT at 65–66.) The timing of that decision was based on Cully's prediction that the markets were headed for a downturn and on Cully's persistence that the Plaintiffs should sell their positions in order to avoid a margin call. (Ex. 13 at 9–11.)

Cully's prediction proved to be erroneous. Just prior to the Plaintiffs' call to Cully on October 8, 1998 at 1:22 pm to liquidate the Account, the financial media had released news that the Federal Reserve would be cutting interest rates. (*Id.* at 11.) After the Plaintiffs' instruction to liquidate the Account, the market rebounded and persisted in that trend for the remainder of the day. *Id.* at 12. Because of the ill-timed sale of the positions in the Account, the Plaintiffs incurred a loss in their portfolio of $531,698.37. (Ex. 18.) Had they still maintained all of their positions, "the account would have had net gains of approximately $682,000." (Ex. 13 at 12.)

### D. NASD Arbitration

Upon receipt of a November 24, 1998 letter from Janney's Philadelphia office confirming the failed Lycos Stock cancellation and the expired OEX Options (Ex. 12), the Plaintiffs initiated the NASD Arbitration against Janney, Cully and the Debtor. During the course of that proceeding, the Plaintiffs submitted a summary of damages, claiming losses of $96,626.81 for the two unauthorized Lycos Stock trades, $78,090 for the four expired OEX Option contracts, and $531,698.37 for the wrongful liquidation of their account. (Ex. 18.) The complaint consisted of claims for unauthorized trades and failure to execute orders, fraud and deceit, breach of fiduciary duty, conversion, violation of state and federal securities laws, violation of Massachusetts Consumer Protection Laws, and wrongful liquidation of account. (Ex. 14.)

The Plaintiffs later entered into a settlement agreement with Janney and Cully in the approximate amount of $250,000. (TT at 78.) The Debtor, however, never appeared or defended himself in the Arbitration. Accordingly, the Panel entered a default judgment against him in the amount of $706,415.18 and statutory interest.[17] (Ex. 14 at 4.) The Panel also award-

---

cal condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Cully's hearsay declaration is admissible under the rule to a limited extent. It may be admitted to show that, because Cully feared exposing Janney to liability, he would not allow further trades. The statement may not, however, be admitted to show *why* he feared liability (because of the OEX and Lycos trade discrepancies). The latter, offered to prove that the Debtor's alleged acts of defalcation were the legal cause of the Plaintiffs' Account

liquidation, falls squarely within the exception to the FRE 803(3) exception. The rule specifically prohibits hearsay statements introduced to show the truth of the fact believed. *United States v. Alzanki*, 54 F.3d 994,1008 (1st Cir. 1995) (citing to *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir.1980)) ("The state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind ... [the rule] must be understood narrowly to limit those admissible statements—'I'm scared' and not belief—I'm scared because [defendant] threatened me' [when used to show threats were made]").

**17.** Although not specifically so enumerated in the NASD Judgment (Ex. 14), the total award

ed $20,120 in attorney fees, $2,851 in costs and $125 for the Plaintiffs' filing fees, for a total judgment of $729,511.18. (*Id.*)

The Plaintiffs followed with an action in the District Court for the District of Massachusetts to enforce the Judgment. *Pendente lite*, the District Court issued a temporary restraining order against the Debtor enjoining the transfer of any interest he might have in real or personal property. But again, the Debtor failed to appear or defend. Accordingly, the Judgment was affirmed on January 5, 2001.[18] (Ex. 15.) The Debtor was further ordered to make payments of $3000 per month beginning February 15, 2001. The Debtor again failed to comply, and the Plaintiffs sought an order of contempt.

On March 7, 2001, the Debtor responded with the instant petition for Chapter 7 relief under the Bankruptcy Code (the "Code"). The Plaintiffs countered with the instant adversary proceeding objecting to the dischargeability of the Judgment pursuant to § 523(a)(4) of the Code.

## II. *POSITIONS OF THE PARTIES*

The Plaintiffs claim that the doctrine of *res judicata* conclusively establishes the nondischargeability of the debt underlying the Judgment.[19] The Plaintiffs aver that claim preclusion bars "litigation on all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceedings," (Pl. Post–Trial Mem. at 8), and claim that despite the Debtor's default, the NASD Panel made specific findings that the Debtor's actions were the legal cause of

the wrongful liquidation of the Account. (*Id.* at 8–11 referring to Ex. 19.) Accordingly, the Plaintiffs maintain that the Panel actually decided that the Debtor's actions constituted an act of defalcation by a fiduciary. According to the Plaintiffs, the Debtor was afforded a full and fair opportunity to present his defenses, and, having chosen not to avail himself of that opportunity at the Arbitration, the Debtor is now barred from challenging or raising new defenses to what is a valid and final judgment.

In the alternative, the Plaintiffs posit that the elements required to except the Judgment from dischargeability pursuant to § 523(a)(4) have been conclusively met by evidence at trial. The Plaintiffs argue that 1) the Debtor owed at least narrow, if not broad, fiduciary duties to them as their stockbroker; and 2) he breached those duties by making unauthorized trades, misrepresenting the status of the OEX Options and concealing his misconduct with false documentation. *Id.* at 15. Finally, in support of their claim arising from the allegedly wrongful liquidation of the Account, the Plaintiffs maintain that Ms. Moore's hearsay statements regarding Cully's reasons for refusing to allow further trading in the Account sufficiently establish the Debtor as the responsible cause for their losses, without more. *Id.* at 17–18; *see* n. 16.

In response, the Debtor claims that *res judicata* is the wrong doctrinal theory to be applied; rather, only the doctrine of collateral estoppel, or issue preclusion, is applicable, if at all. The Debtor also main-

---

of $706,415.18 equates to the total amount of damages claimed by the Plaintiffs in their summary of damages. (*See* Ex. 18.)

**18.** The District Court's judgment affirming the NASD Judgment included 12% interest thereon, in the amount of $33,817.44 plus

costs in the amount of 1,178.46 for a total judgment of $764,507.08. (Ex. 15.)

**19.** The Court previously declined to adopt this argument on the Plaintiffs' earlier motion for summary judgment.

tains that the necessary elements for issue preclusion have not been proved because the characterization of his conduct as acts of defalcation by a fiduciary was never specifically before the Panel. Furthermore, the Debtor reminds the Court that the issues presently before it were never "actually litigated" in the Arbitration proceeding, in light of the Debtor's default there.

As to the merits of the Plaintiffs' § 523(a)(4) claim itself, the Debtor maintains that the Plaintiffs have failed to establish, through a preponderance of the evidence, that the Debtor owed the Plaintiffs any fiduciary duties or that his actions amounted to a defalcation under § 523(a)(4). Further, the Debtor argues that the Plaintiffs failed to prove that the Debtor's alleged actions were the cause of the Plaintiffs' losses resulting from the liquidation of the Account.

## III. DISCUSSION

### A. Res Judicata

■ "Res judicata ensures the finality of decision; under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Brown v. Felsen, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). The term res judicata embraces two discrete concepts: claim preclusion and issue preclusion. Baker v. Gen. Motors Corp., 522 U.S. 222, 232 n. 5, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). The Supreme Court has defined the distinction between these two concepts as follows:

> Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation on the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim.

New Hampshire v. Maine, 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

■ The Plaintiffs are correct in stating that, in the case at bar, the doctrine of claim preclusion bars the Debtor from raising defenses to the underlying indebtedness represented by the Judgment as affirmed by the District Court. It is well established, however, that claim preclusion does not bar a bankruptcy court's review of the nature of the debt in question for purposes of determining its dischargeability. Archer v. Warner, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (quoting Brown, 442 U.S. at 138, 99 S.Ct. 2205 ("The mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt.")). The dischargeability of a debt in a bankruptcy proceeding is the exclusive province of the bankruptcy courts. Brown, 442 U.S. at 139, 99 S.Ct. 2205.

■ The more germane question, therefore, is whether this Court's review of the dischargeability of the Judgment is barred by collateral estoppel, or issue preclusion. See Grogan v. Garner, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (stating that collateral estoppel applies in discharge exception proceedings pursuant to § 523(a)). A party seeking to invoke collateral estoppel in a subsequent action must establish four essential elements: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must

have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the judgment. *Sullivan v. Sullivan (In re Sullivan)*, 217 B.R. 670, 674 (Bankr. D.Mass.1998) (*Sullivan I* ).

In the instant case, the applicability of collateral estoppel is easily dispatched. The material issues here could not have been "actually litigated" because the relevant judgment was entered by default. The Debtor never appeared or defended against any of the twenty-one allegations brought in the Arbitration. "In the case of a judgment entered by ... default, none of the issues is actually litigated. Therefore, [issue preclusion] does not apply with respect to any issue in a subsequent action." *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 . (2000) (quoting Restatement (Second) of Judgments § 27, cmt. e at 257 (1982)); *FTC v. Wright (In re Wright)*, 187 B.R. 826, 832 (Bank.D.Conn.1995) (noting that, as to federal courts evaluating the preclusive effect of default judgments entered in a prior federal proceeding, courts uniformly held the issue at bar had not been fully litigated). *See also, Staniunas v. Delisle (In re Delisle)*, 281 B.R. 457, 462–63 (Bank.D.Mass.2002) (citing to *Phalon v. Varrasso (In re Varrasso)*, 194 B.R. 537 (Bank.D.Mass.1996)) (applying the Massachusetts standard for applicability of collateral estoppel and holding that the issue in question was not barred since default judgment in state court meant the issue had not been fully litigated).[20]

### B. Dischargeability of the Judgment

The Plaintiffs have the burden of proving, by a preponderance of the evidence, that the debt represented by the Judgment is nondischargeable pursuant § 523(a)(4) of the Code. *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 (1st Cir. 2002); *Grogan*, 498 U.S. at 285, 111 S.Ct. 654. That Code section excepts from discharge any debt arising from an act of fraud or defalcation by a fiduciary. 11 U.S.C. § 523(a)(4) (2000). Accordingly, the Plaintiffs must demonstrate, with respect to each of the controverted Lycos and OEX trades, that (1) the Debtor was acting in a fiduciary capacity within the meaning of § 523(a)(4); and (2) the Debtor's actions constituted defalcations. The Plaintiffs must further establish that those acts were the substantial legal cause of the losses they incurred through the liquidation of the Account.

### 1. Stockbrokers as Fiduciaries

The definition of "fiduciary" for the purposes of § 523(a)(4) has been narrowly construed. The term applies only to relationships arising out of express or technical trusts, and not to trusts that are implied in law as a remedy. *Sullivan I*, 217 B.R. at 675. Thus, constructive trusts and trusts imposed by law do not establish a "fiduciary" relationship within the meaning of § 523(a)(4). *Id.* Here, no express trust is claimed. The issue, therefore, is whether a technical trust exists. A technical trust is one that is imposed by either statutory or common law. *Id.* Although the definition of "fiduciary" under

---

**20.** Federal law determines whether an earlier judgment, rendered in a federal court, bars the maintenance of a subsequent federal court action. *Banco Santander de P.R. v. Lopez–Stubbe (In re Colonial Mort. Bankers Corp.)*, 324 F.3d 12, 16 (1st Cir.2003). Accordingly, because the judgment at issue is one rendered by a federally regulated entity and affirmed by a federal court, this Court looks to precepts of federal common law relevant to the applicability of collateral estoppel vis a vis default judgments. *In re Wright*, 187 B.R. at 834–35 (holding that federal common law is the standard to be applied in determining preclusive effect of issues determined in prior federal court adjudications).

the Code is a matter of federal law, courts have consistently looked to relevant state law for guidance in determining the existence of a technical trust. *Id.*

Under Massachusetts law, the relationship between stockbroker and client can constitute either an ordinary business relationship or a fiduciary relationship, depending on the *scope* of the responsibilities, if any, undertaken by the stockbroker. *Patsos v. First Albany Corp.*, 433 Mass. 323, 741 N.E.2d 841, 848–49 (2001) (citing to *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 824 (10th Cir.1986) (stating that a broker generally owes fiduciary duties to a customer because the broker is the customer's agent, but the scope of those duties turns on the nature of the broker's responsibilities)). The "scope of a stockbroker's fiduciary duties is a factual issue that turns on the manner in which investment decisions have been reached and transactions executed for the account." *Id.* The degree of discretion exercised by the stockbroker is a key consideration. *Id.*

In *Patsos*, the Massachusetts Supreme Judicial Court distinguished accounts which are "nondiscretionary" from those which are "discretionary." "Where the account is 'nondiscretionary,' meaning that the customer makes the investment decisions and the stockbroker merely receives and executes a customer's orders, the relationship generally does not arise to *general* fiduciary duties." *Id.* (Emphasis supplied.) In nondiscretionary accounts, each transaction is viewed singly. The broker, therefore, owes fiduciary duties limited to each transaction. *Id.*, 741 N.E.2d at 849–50. "For nondiscretionary accounts ... the broker is bound to act in the customer's interest when transacting busi-

ness for the account, but all duties to the customer cease 'when the transaction is closed.'" *Id.* at 849 (citing to *Hill*, 790 F.2d at 824) (stating that in a nondiscretionary account, a broker's duties are narrow—primarily not to make unauthorized trades).[21]

Transactional duties owed a client with respect to a nondiscretionary account include those to (1) recommend a stock only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) inform the customer of the risks involved in purchasing or selling a particular security; (4) refrain from self-dealing; (5) disclose any personal interest the broker may have in a particular recommended security; (6) refrain from misrepresenting any fact material to the transaction; and (7) transact business only after receiving prior authorization from the customer. *Id.* at 850 n. 15 (citing to *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 952 (E.D.Mich.1978) *aff'd*, 647 F.2d 165 (6th Cir.1981)).

When a customer entrusts the broker to select *all* the transactions to be made in the account without necessarily obtaining the prior approval of the client, the account is deemed "discretionary," and the broker owes broad fiduciary duties to the client. With respect to such a discretionary account, the broker has a continuing duty to (1) manage the account in a manner directly comporting with the needs and objectives of the customer; (2) keep informed regarding changes in the market which may affect the client's account and act accordingly; (3) keep the customer informed as to each completed transaction;

---

**21.** An account that begins as a nondiscretionary account may become discretionary if the broker subsequently usurps control over the account. *Id.* at 850 n. 17.

and (4) explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged. *Id.* n. 16.

A course of dealing wherein the broker executes trades without the prior approval of the client suggests that the account is discretionary. *Id.* Similarly, if a broker has acted as an investment advisor and the customer has frequently relied on that advice, there is a strong indication that the account is discretionary. *Id.* On the other hand, frequent communications between broker and customer regarding the prudence of contemplated trades suggests that the account is nondiscretionary. *Id.* The documentation regarding the customer's account and the manner in which trades are executed are telling factors in determining whether the customer has entrusted the broker to manage the account. *Id.* Additionally, where other factors are present, the investment acumen of the parties and any social or personal ties among them may also be of consideration. *Id.* at 851.

In the instant case, the Court is persuaded that the Account was a strictly nondiscretionary account as it pertained to trading in Lycos Stock. Ms. Moore testified that she communicated daily with the Debtor (several times a day in fact) to keep abreast of the market, follow the performance of stocks in her portfolio and discuss strategies. The Debtor also had strict instructions to seek her approval prior to executing any trades for the Account. Moreover, the Plaintiffs are sophisticated investors. Mr. Moore is a licensed stock broker and both Plaintiffs are professionally engaged in occupations requiring knowledge of the financial markets. Although the Plaintiffs may have "heavily relied" on the Debtor's advice and recommendations regarding stock trades, the ultimate decision to buy or sell was strictly theirs. Nothing in the record indicates any degree of control by the Debtor in matters relating to investment decisions of individual stocks. Accordingly, the Debtor owed only transactional duties to the Plaintiffs, limited to each individual trade.

Although a closer question, this Court also deems the nature of the Account with regard to OEX Option trades to have been nondiscretionary. Ms. Moore testified that, consistent with her practice with respect to the trading of individual stocks, the Debtor was instructed not to execute any trades in the OEX Options without her prior knowledge and approval. Ms. Moore had frequent communications with the Debtor regarding the status of the OEX Options and strategies to be employed. Although Ms. Moore relied entirely on the Debtor's representation of OEX Option prices, the record indicates that, ultimately, the final decision to buy or sell rested with the Plaintiffs. Moreover, there is no indication that the Debtor usurped control of the Account in matters of OEX Option trading. Accordingly, the Debtor's fiduciary duty to the Plaintiffs was limited to his conduct within each individual trade.

2. Standard and Meaning of "Defalcation" For Purposes of § 523(a)(4)

A defalcation for purposes of § 523(a)(4) necessarily means there has been a breach of a fiduciary duty, but not all breaches of fiduciary duty constitute a defalcation. *See Baylis,* 313 F.3d at 17–18. Courts are divided on the standard to be employed in determining which breaches of fiduciary duty reach the level of "defalcation" for purposes of nondischargeability under that Code section. *Id.* at 18 (noting differing interpretations on the definition of defalcation both outside and within this Circuit); *Sullivan v. Sullivan (In re Sulli-*

*van),* 238 B.R. 230, 236–38 (Bankr.D.Mass. 1999) (*Sullivan II* ) (same). In this Circuit, however, the question is now conclusively decided. In *Baylis,* the First Circuit Court of Appeals defined "defalcation" for purposes of § 523(a)(4) as an act "so egregious in nature that [it] come[s] close to the level that would be required to prove fraud, embezzlement, or larceny." *Baylis,* 313 F.3d at 20.

■ Although defalcation is determined through an objective standard, it involves "some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement . . . . [F]or an act to fall under the 'defalcation' exception to discharge, it must be a serious one indeed, and some fault must be involved." *Id.* at 19. The *Baylis* court analogized the requisite degree of fault to the "scienter" standard for securities fraud. "A form of recklessness can meet the requirement of scienter but it is 'more like a lesser form of intent.'" *Id.* at 20 (quoting *Rizek v. SEC,* 215 F.3d 157, 162 (1st Cir. 2000)).

■ Accordingly, mere acts of negligence or conscious risk taking do not constitute "defalcation" for the purposes of § 523(a)(4). *Id.* Rather, a defalcation must involve an act or omission tending to show such an extreme departure from the standards of ordinary care as to reach the level of extreme recklessness. *Id.; cf. Rizek,* 215 F.3d at 162 (defining reckless conduct under securities law as "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care"). The totality of the circumstances in each particular case "will provide the level of wrongdoing needed to constitute a defalcation." *Id.*

3. Application of the § 523(a)(4) Standards

a. The Lycos Stock Trades

■ It is unequivocally clear, based on the testimony and the record before the Court, that the Debtor had a fiduciary duty to the Plaintiffs to execute trades only after receiving authorization from the Plaintiffs, and that duty was breached in regard to the two purchases of Lycos Stock on July 7, 1998. Ms. Moore testified in several instances that the Debtor was "not to do anything" without her prior approval. Whether the two Lycos trades were transacted willfully or through inadvertence is immaterial, because even if the purchase was accidental, the Debtor then had a duty to report the error honestly and to make a good faith effort to rectify the error. The Debtor did neither. Through her repeated inquiries to the Debtor as to why she never received confirmation of the cancellations, Ms. Moore had effectively instructed the Debtor to arrange for the cancellation of the unauthorized Lycos purchases. The Debtor then had a duty to promptly execute this instruction *in a manner best suited to serve the customer's interests. See Patsos,* 741 N.E.2d at 850 n. 15 (emphasis supplied).

Even if the Debtor placed the cancellations in the Janney computer on July 8, 1998 (which through some computer error did not register in the Account), his duty to rectify his prior error did not end there. Nothing in the record suggests that the Debtor made follow-up inquiries or exerted any effort whatsoever to ascertain whether the cancellation of the purchases had indeed registered in Janney's computer system, despite Ms. Moore's repeated complaints that she never received the cancellation confirmations.

Ms. Moore also repeatedly told the Debtor that she was not receiving account

statements regularly. Given Ms. Moore's repeated inquiries regarding the cancellation of the unauthorized Lycos trades during the ensuing three months and given the contemporaneous issues related to the OEX Options, the Debtor was on notice that something was amiss in the Account. Under those circumstances, the Debtor's failure to make follow-up inquiries into the matter and his mere verbal assurances that the stocks had been cancelled without further investigation was not an execution of the Plaintiffs' instructions in a "manner best suited to their interests."

In light of Ms. Moore's continued inquiries, the Debtor's repeated failures to act went beyond an act of omission constituting mere negligence or the conscious taking of a risk. The Debtor's failures to act constituted, at the very least, a lack of diligence reaching the level of extreme recklessness. Accordingly, the Debtor's failure to make a good faith effort to follow the Plaintiff's instructions to cancel the unauthorized Lycos trades constituted a defalcation within the meaning of § 523(a)(4). The damage resulting therefrom resulted in a loss to the Plaintiffs in the amount of $96,626.81, which is nondischargeable pursuant to § 523(a)(4).

b. The Expired OEX Options

Though his fiduciary duties to the Plaintiffs may have been limited to each individual OEX transaction, the Debtor breached them with regard to the four OEX option blocks in question. By allowing these options to expire worthless, the Debtor breached his duty to promptly execute the Plaintiffs' orders regarding the options in a manner best suited to their interests. Moreover, his repeated breaches of this duty reached the level of extreme recklessness under the given circumstances.

The first set of expired OEX option blocks which expired on April 18, 1998 could, by itself, be said to have been a mere act of negligence. After this first set of options expired, however, Ms. Moore promptly made inquiries with the Debtor. The Debtor's response to Ms. Moore's inquiry, however, indicates he did not even check the records to ascertain that nothing unusual had indeed occurred. Instead, he summarily dismissed her inquiry by stating that the Janney account statements were misleading.

The Debtor's lack of care in handling the OEX Options did not stop there, however. In subsequent months, the Debtor allowed three more blocks of contracts to expire worthless on three separate occasions. One set of contracts expired in July of 1998, followed by another set in August of 1998, followed by another set of expired contracts in September of 1998. *See* n. 11. Again and again, the Debtor summarily dismissed Ms. Moore's concerns by simply stating that nothing had expired worthless. There is no evidence that the Debtor took any steps to even investigate Ms. Moore's repeated inquiries. When the Debtor did finally take affirmative steps regarding the matter, it was not to investigate or to rectify the problem, but instead to mislead the Plaintiffs as to the status of the Account by providing them with false documentation regarding the status of the expired options.

Under the circumstances at hand, it cannot be said that the Debtor's repeated failures, over a period of five months, were acts of mere negligence. Especially in the context of the contemporaneous discrepancies in Lycos stock, the Debtor's continued lack of diligence in handling the OEX contracts presents a reckless and knowing disregard of his duties to the Plaintiffs. The Court finds that, at the very least, the Debtor's conduct with regard to the OEX

Options constitutes "an extreme departure from the standards of ordinary care" and thus extreme recklessness. *Baylis,* 313 F.3d at 20. His actions regarding the four expired OEX Option blocks, therefore, constituted a defalcation of his fiduciary duty to the Plaintiffs for the purposes of § 523(a)(4). Accordingly, the Plaintiffs' loss resulting therefrom, in the amount of $78,000, is nondischargeable.

### C. Wrongful Liquidation of the Account

■ Finally, the Plaintiffs claim that the portion of the Judgment in the total amount of $531,698.37, representing their losses arising from the ultimate liquidation of the Account, should also be held nondischargeable. In support, they argue that, because the Debtor's defalcations arising out of the Lycos trades and the OEX Options were the direct cause of Cully's unwillingness to allow them to hedge their positions, the Debtor was truly responsible for their losses. Here, the Plaintiffs have failed to meet their burden of proof. The only admissible evidence with respect to Cully's refusal to permit the Plaintiffs to employ hedging strategies is that Cully did not want to expose Janney to liability. There is no admissible evidence about *why* Cully took that position. *See* n. 16. Without that "why" there is no connection to any act by the Debtor.

Furthermore, even if Ms. Moore's full testimony pertaining to Cully's reasons for refusing further trades in the Account were admitted, the causal connection between Cully's refusal and the Plaintiffs' resulting losses from the untimely liquidation of their Account is tenuous. The Plaintiffs could have held their positions, even though they were not allowed to purchase hedging options. (TT at 65.) The

ultimate decision to liquidate the Account was made by the Plaintiffs. Although they could have simply held their positions in hopes that the market would rebound, they made a calculated risk to liquidate the account on October 8, 1998 at 1:22 pm, with "the expectation that they could buy back the shares when [the account] hit a lower [margin] level and began to rebound." (Ex. 13 at 11.) The Plaintiffs concede that their decision to liquidate the Account at that particular time was based solely on Cully's erroneous report of the state of the market on that date. Cully informed the Plaintiffs that there were no indications that the market would likely rebound, although the media had reported otherwise.

■ News that the Federal Reserve will cut interest rates is information widely disseminated through the financial media and the type of news widely followed by sophisticated investors such as the Plaintiffs. The fact that the Plaintiffs did not avail themselves of such widely available data and relied on Cully's representation of the state of the market leads this Court to the conclusion that the Plaintiffs' own investment decision, coupled by Cully's advice, constituted the "substantial cause" of the liquidation. The fact that the market significantly rebounded a few hours following the liquidation of the Account is merely a consequence of an ill-fated investment decision that was ultimately made by the Plaintiffs. Accordingly, the Plaintiffs' losses on account of their liquidation of the Account do not, on this record, arise from any act by the Debtor constituting defalcation while acting in a fiduciary capacity for the purposes of § 523(a)(4). As such, the portion of the Judgment arising from losses associated with the liquidation of the Account is dischargeable.[22]

---

**22.** At trial, Ms. Moore testified that Janney and Cully entered into a settlement agreement

## IV. CONCLUSION

For the reasons set forth above, the debt represented by the Judgment in the amount of $174,716.81, plus interest and costs, pertaining to the Plaintiffs' losses related to the Lycos Stock and OEX Option trades is nondischargeable. The balance of the Judgment representing losses arising from the liquidation of the Account is dischargeable.

A Judgment in conformity with this Memorandum of Decision shall issue in conjunction herewith.

### JUDGMENT

For the reasons set forth in this Court's Memorandum of Decision of even date, the sum of $174,716.81, plus interest and costs, owed by the Defendant to the Plaintiffs pursuant to a Judgment of the National Association of Securities Dealers, dated August 22, 2000, and affirmed by Judgment of the United States District Court for the District of Massachusetts (Freedman, D.J.), dated February 5, 2001, is deemed nondischargeable. The balance of the debt represented by the said Judgment is discharged.

with the Plaintiffs in the approximate amount of $250,000. (TT at 7.) Although the Plaintiffs' attorney stated that this amount was offset from the final judgment entered against the Debtor, this Court's review of the Plaintiffs' summary of damages and the total amount of the Judgment leads the Court to a contrary conclusion. *Compare* Ex. 18 and Ex. 14 at 2. Under Massachusetts law, where two actors are the joint and concurrent cause of a party's damages, the resulting damages are attributed to the tortfeasors on an equal basis. *See Zeller v. Cantu*, 395 Mass. 76, 478 N.E.2d 930 (1985) (interpreting Mass. Gen. Laws. c. 231B § 2 (Uniform Joint Tortfeasors Act) and holding that a codefendant's share of damages are attributed on a pro rata basis). Accordingly, had the Court found that the Debtor's actions with regard to the Lycos Stock and OEX Options were a substantial legal cause of the Plaintiffs' damages with respect to the Account liquidation, the maximum relevant portion of the Judgment to be nondischargeable would be, at most, roughly $250,000. *See In re Atlantic Fin. Man., Inc. Sec. Lit.*, 718 F.Supp. 1012, 1016 (D.Mass. 1988) (applying Massachusetts law).